**ALASKA NATIVE TRIBAL HEALTH CONSORTIUM, d/b/a Alaska Native Medical Center, Appellant,**

v.

**SETTLEMENT FUNDS HELD FOR OR TO BE PAID ON BEHALF OF E.R., a minor, by and through his legal guardian, Martha RIDLEY, Appellee.**

**Alaska Native Tribal Health Consortium, d/b/a Alaska Native Medical Center, Appellant/Cross–Appellee,**

v.

**Settlement Funds Held for or to be Paid on Behalf of David W. Warden, Appellee/Cross–Appellant.**

Nos. S–10662, S–10696, S–10785.

Supreme Court of Alaska.

Jan. 30, 2004.

Rehearing Denied April 2, 2004.

---

Peter J. Aschenbrenner, Aschenbrenner Law Offices, Inc., Fairbanks, for Appellant/Cross–Appellee Alaska Native Tribal Health Consortium.

J. Mitchell Joyner, Law Office of J. Mitchell Joyner, Anchorage, for Appellee E.R.

Robert A. Rehbock, Rehbock & Rehbock, Anchorage, for Appellee/Cross–Appellant David W. Warden.

Before: BRYNER, Chief Justice, MATTHEWS, FABE, and CARPENETI, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

In this consolidated appeal[1] we address whether the Alaska Native Tribal Health Consortium (the Consortium) can enforce a health care provider lien on settlement proceeds received by Alaska Native patients from third-party tortfeasors. If we determine that such a lien can be enforced, the principal question that follows is whether the lien must be reduced by a pro rata share of the patients' attorney's fees. These questions arise in two cases that share similar factual backgrounds. Each case involves an Alaska Native who was treated as a patient at the Alaska Native Medical Center (ANMC) for injuries caused by third-party tortfeasors. ANMC, run by the Consortium, treats Alaska Natives for free. The Consortium recorded hospital liens on the settlements that two patients, Warden and E.R., obtained from their respective tortfeasors. Both patients' attorneys disputed the validity of the liens. In both cases, the superior court concluded that the health care provider lien is valid and should be paid in full, less a pro rata share of the patient's attorney's fees and costs incurred in obtaining the recovery.[2] Because the Consortium has a federal right to enforce a statutory health care provider lien, and because it would be unjustly enriched if it did not pay a pro rata share of attorney's fees, we affirm the superior court's determination in both cases. We hold that the Consortium's statutory health care provider lien is enforceable and is subject to a pro rata reduction for attorney's fees and costs.

## II. FACTS AND PROCEEDINGS

### A. The Consortium's Claim to Settlement Funds Obtained on Behalf of David W. Warden

On February 15, 2000, David Warden, an Alaska Native, was injured in a motor vehicle accident with Mary Copley, who was insured by Allstate Insurance Company. Warden received medical treatment from ANMC for injuries to his back and neck between February 15, 2000 and March 8, 2001.

Shortly after the accident, Warden engaged counsel Robert Rehbock and entered into a contingency fee agreement entitling Rehbock to a percentage of any recovery. Allstate entered into negotiations with Warden, seeking to minimize its obligation by emphasizing Warden's pre- and co-existing conditions. Allstate declined to enter any settlement agreement unless there was full and final release of all parts of the claim. The Consortium did not respond to Allstate's efforts to obtain medical records and information concerning the care Warden received, only providing such documentation after further efforts by Warden and Rehbock.

On May 3, 2001, the Consortium recorded a health care provider's lien pursuant to AS 34.35.450–.482 for $8,947.22, the alleged value of services provided to Warden. Copies of the recorded lien were forwarded by certified mail to Allstate and its insured, Mary Copley. The transmittal letter to Allstate included a request that ANMC be named as the payee on any check issued arising out of the accident. The Consortium provided a copy of the lien to Warden, who apprised Allstate of the lien claim and continued to seek recovery for all claims.

On August 3, 2001, Allstate settled with Warden for $24,947.22 to cover all losses and to release all claims against Copley and Allstate. Out of this amount, Allstate issued a separate settlement check on the same day for $8,947.22 made payable to "Rehbock Rehbock & Wittenbrader In Trust for David Warden, and ALASKA Native Medical Center." The same day, Rehbock informed the Consortium that he proposed to "turn over two-thirds of the total check for that lien and receive the remaining one-third" for his fees but that he would "not disburse any of the

---

1. These cases were not consolidated for briefing or argument. We have consolidated them for purposes of the opinion because they share similar factual backgrounds and raise similar legal issues.

2. The Consortium appeals the reduction in both cases. Only in *Warden*, however, did the patient file a cross-appeal of the superior court's determination that the Consortium could foreclose on its lien.

disputed lien to my client or for my fee pending our resolution of" the dispute. The Consortium therefore declined to endorse the check, and the disputed funds were placed with the court and then, by stipulation, held in Rehbock's trust account. Rehbock has at this point only taken for his fee one-third of the non-disputed funds.

The Consortium filed a complaint in superior court on September 9, 2001 against "Settlement Funds Held for or to be Paid on Behalf of David W. Warden" seeking to foreclose its lien under AS 34.35.480. Warden's answer admitted that the Consortium rendered medical services to Warden and had recorded a lien for $8,947.22, but challenged the validity of the lien. The parties filed cross-motions for summary judgment, with the Consortium moving to foreclose its lien and with Warden arguing that the Consortium could not assert a lien because Warden was entitled to free treatment at ANMC, or in the alternative, that the Consortium's lien recovery should be reduced by the percentage in the contingency fee agreement between Warden and Rehbock. Without elaborating on its reasoning, the superior court held that the Consortium was entitled to foreclose its lien and was entitled to the full amount less its pro rata share of the attorney's fees and costs Warden incurred to obtain the settlement proceeds from Allstate.

The Consortium appeals the pro rata reduction of its lien recovery. Warden cross-appeals the superior court's ruling that the Consortium was entitled to foreclose on its lien.

### B. The Consortium's Claims to Settlement Funds Obtained on Behalf of E.R.

In December 1999 E.R., a minor, suffered second- and third-degree burns on his feet and legs when he was placed in a bathtub of scalding water. As an Alaska Native, E.R. was entitled to free medical services at the Alaska Native Medical Center, a facility operated by the Consortium. E.R. was treated on first an inpatient and then an outpatient basis, with his last treatment occurring on August 11, 2000. On October 25, 2000, the Consortium filed a health care provider's lien

pursuant to AS 34.35.450–.482 for $30,081.65 for the services provided to E.R.

J. Mitchell Joyner represented E.R., through his parent Martha Ridley, in a suit against Richard Knowles, who owned the property on which E.R. was injured. On March 26 and 27, 2001, Joyner apparently called and then wrote to the Consortium offering to settle the lien claim for $5,000 in light of Joyner's assertion that the lien was "deficient on its face." On March 30, 2001, E.R. moved under Alaska Civil Rule 90.2 for approval of a settlement agreement to resolve its claim against Knowles for $95,000. That motion specifically addressed the Consortium lien, declaring that the lien was unenforceable. The superior court approved the settlement on April 2, 2001. Notice of the approval was sent to counsel for Knowles, who was insured by State Farm.

Following the superior court's approval, Joyner drew from the $95,000 settlement his attorney's fees of $31,666 (the one-third contingency fee agreed upon with Ridley) and roughly $9,260 in costs. On April 3, 2001, Joyner advised the Consortium of the settlement and explained that, given E.R.'s challenge of the lien's validity, Joyner would hold the $30,081.65 in his trust account until the disputed matter was resolved.

In August 2001 the Consortium filed a complaint in superior court against "Settlement Funds Held for or to be Paid on Behalf of E.R." seeking to foreclose on its lien. E.R.'s answer denied the lien's validity, and in a motion for summary judgment, argued that the lien was invalid because it was filed in an untimely manner, more than the ninety days after the last service provided by a physician, required by AS 34.35.460. In the alternative, E.R. asserted that if the lien was valid, then the amount owed to the Consortium should be subject to a pro rata reduction for the cost incurred in obtaining the recovery from Knowles. The Consortium also moved for summary judgment.

In May 2002 the superior court rendered its decision and entered judgment. The court ruled that "[f]ederal law and decisions" indicate that the Consortium's lien was valid, declared that any attack by Joyner on the

lien was denied because of his conflict of interest in advocating the lien while pursuing a settlement yet later challenging it, and held that the Consortium was "entitled to 100% of its liened amount, $30,081.65, less a proportionate share of the costs and attorney fees incurred."

The Consortium did not seek a stay of the decision, and the trust funds were disbursed to E.R. and the Consortium in accordance with the court's order. Joyner's trust account thus currently contains no settlement funds.

The Consortium appeals the superior court's ruling that its recovery should be reduced by a proportionate share of Joyner's attorney's fees and costs.

## III. DISCUSSION

To resolve the questions appealed, we must first consider both the rights of the Alaska Native Tribal Health Consortium and the rights of Alaska Native patients who seek a judgment or settlement for injuries treated by ANMC without cost. We must decide whether federal and state law allow the Consortium to enforce a health care provider lien on settlement proceeds from third-party tortfeasors when the patient personally owed nothing to the Consortium. Warden argues that Alaska Native patients are federally entitled to free health care and should not have to satisfy the Consortium's claim from the proceeds of their personal injury recovery. The Consortium contends that because Warden negotiated a separate settlement on behalf of the Alaska Native Medical Center, the full amount of the proceeds did not belong to Warden. The Consortium further asserts that Congress federalized its state rights to insurance-funded recoveries from tort actions under 25 U.S.C. § 1621e(a), and that AS 34.35.450 is the state mechanism that actualizes this federal right. If the Consortium's health care provider lien is enforceable, we must then decide whether the lien should be reduced by a pro rata share of attorney's

fees expended to obtain the settlement proceeds. We will assess each of the parties' arguments following the standard of review.

### A. Standard of Review

We review grants of summary judgment de novo.[3] "[We] may consider any argument ascertainable from the record, even if the superior court did not rule on it, when reviewing the summary judgment order."[4] We similarly apply our independent judgment when reviewing questions of statutory interpretation and "must 'adopt the rule of law that is most persuasive in light of precedent, reason, and policy.' "[5]

### B. The Consortium Is Entitled To Enforce Its Health Care Provider Lien.

We must first consider whether federal law allows enforcement of the Consortium's health care provider lien. Warden charges that enforcement of the Consortium's lien would violate federal law. Warden argues that 25 U.S.C. § 1621u entitles him to free medical services and that "requir[ing] him to satisfy [the Consortium] claim from the proceeds of his personal injury recovery violates that statute." That statute states, in relevant part, that "[a] patient who receives contract health care services that are authorized by the [Indian Health] Service shall not be liable for the payment of any charges or costs associated with the provision of such services."[6]

The Consortium maintains that § 1621u concerns payment arrangements for fee-for-service health care providers, such as Providence or Alaska Regional Hospitals, but does not address tribal health contractors like the Consortium who are under contract with the Secretary of Health and Human Services. The Consortium's interpretation is bolstered by 25 U.S.C. § 1621r, which also uses the term "contract health services" to

---

**3.** *Bennett v. Weimar,* 975 P.2d 691, 694 (Alaska 1999).

**4.** *Jackinsky v. Jackinsky,* 894 P.2d 650, 654 (Alaska 1995).

**5.** *Jerue v. Millett,* 66 P.3d 736, 740 (Alaska 2003) (quoting *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

**6.** 25 U.S.C. § 1621u(a) (2001).

mean "private contract health services providers." [7]

We note at numerous points below that Warden as an Alaska Native does have a federal right to free care.[8] This federal right, however, is not violated by enforcement of the Consortium's lien. All of Warden's federal claims, as well as Warden's claim that the Alaska Legislature "did not intend (even assuming it could constitutionally do so) to disenfranchise Native Beneficiaries of the advantage to them of obtaining free care and pocketing the money they save," fail because they rest on the same core fallacy, namely that all of the settlement funds are Warden's and that satisfying the lien from the recovery essentially reduces his damages and makes him pay for his medical care.[9]

As the Consortium argued below, however, the settlement fund does not "belong" to Warden because the settlement is not composed entirely of his funds; he negotiated for a separate settlement with Allstate and a separate check for ANMC, so only the funds not subject to the Consortium's lien are Warden's, and thus the Consortium's lien takes nothing from Warden to which he is entitled.[10]

Warden also contends that the Consortium's lien diminishes Warden's cause of action and his damages, in violation of 25 U.S.C. § 1621e(d), which states that "[n]o action taken by . . . a tribal organization to enforce the right of recovery . . . shall affect the right of any person to any damages."

We agree with the Consortium's argument that § 1621e(d) merely protects a patient's right to sue and prevents a tribal health contractor from giving to the tortfeasor a complete release of all claims. Enforcement of the Consortium's lien does not affect Warden's right to damages, but rather just the amount of damages.

■ We determine that federal law does not prohibit and in fact specifically provides for enforcement of the Consortium's health care provider lien to the same extent a nongovernmental provider is entitled to enforce such a lien under state law. The Consortium correctly argues that in 25 U.S.C. § 1621e(a), Congress federalized the Consortium's state rights to insurance-funded recoveries from tort actions. Under this federal statute, a tribal organization providing health services has the right to recover reimbursement from third parties for reasonable expenses. This right is enforceable to the same extent that the law entitles a nongovernmental provider or an individual to recover from third parties if the individual had been required to pay and did pay for services. Section 1621e(a) provides that

> a tribal organization shall have the right to recover the reasonable expenses incurred by . . . a tribal organization in providing health services . . . to any individual to the same extent that such individual, or any nongovernmental provider of such services, would be eligible to receive reimbursement or indemnification for such expenses if—
> (1) such services had been provided by a nongovernmental provider, and

7. " 'Whenever possible, we construe each part or section of a statute with every other part or section, to produce a harmonious whole.' " *Romann v. State, Dep't of Transp. & Pub. Facilities,* 991 P.2d 186, 190 (Alaska 1999) (quoting *Benner v. Wichman,* 874 P.2d 949, 957 (Alaska 1994)); *see also Nystrom v. Buckhorn Homes, Inc.,* 778 P.2d 1115, 1122 (Alaska 1989) ("We are supported in our conclusion concerning the meaning of the term 'individual' by reference to the usage of that term in other sections of the lien law.").

8. *See generally Yukon–Kuskokwim Health Corp. v. Trust Ins. Plan of Southwest Alaska,* 884 F.Supp. 1360 (D.Alaska 1994).

9. Warden also points to 25 U.S.C. § 1681, which prohibits the Indian Health Service from charging Indians with the economic means to pay

until Congress selects a policy for doing so, which it has not yet done. Apart from sharing the same faulty root, the Consortium correctly points out that § 1681 is now "omitted" from the United States Code, as it was an appropriations rider in 1996 that was never subsequently reenacted. *See* 25 U.S.C.A. § 1681 (West 2003).

10. This reasoning also defeats another claim of Warden's, namely that AS 34.35.450 (discussed below) does not create a new right or cause of action against Warden or Warden's funds. Again, enforcement of the Consortium's lien was not a new cause of action against Warden or his funds since Warden negotiated for a separate check for ANMC; thus, those funds are not Warden's.

(2) such individual had been required to pay such expenses and did pay such expenses.

The Consortium correctly contends that § 1621e(a) "strips [Warden] of a federal defense to [the Consortium's] state lien foreclosure action." The Consortium's rights to lien foreclosure under federal law should equal the rights that a nongovernmental provider of health services could exercise under state law. We conclude that under 25 U.S.C. § 1621e(a), the Consortium has a federal right to enforce a statutory health care provider lien to the same extent that state law allows a nongovernmental provider to enforce such a lien.

The state statute creating the hospital lien here is AS 34.35.450(a). The Consortium asserts that AS 34.35.450 is the state statutory mechanism by which the Consortium's federal rights are actualized in terms of rights in recoveries funded by third-party liability insurance carriers, and indemnity, or health insurance contracts. Alaska Statute 34.35.450(a) provides as follows:

> An operator of a hospital in the state ... who furnishes service to a person who has a traumatic injury has a lien upon any sum awarded to the injured person or the personal representative of the injured person by judgment or obtained by a settlement or compromise to the extent of the amount due the hospital ... for the reasonable value of the service furnished before the date of judgment, settlement, or compromise, together with costs and reasonable attorney fees that the court allows, incurred in the enforcement of the lien. AS 34.35.450—34.35.480 do not apply to a claim, right of action, or money accruing under AS 23.30 (Workers' Compensation Act).

Warden argues that state law does not create an enforceable lien where another paid for the medical services and the Native American beneficiary owed the hospital nothing. Warden asserts that a hospital lien cannot exist without an underlying debt, pointing to the language in AS 34.35.450(a) providing for a lien "to the extent of the *amount due* the hospital ... for the reasonable value of the service furnished." (Emphasis added.) This language is in contrast to AS 34.35.450(b), which allows the hospital a lien on the amount that an insurer has contracted to pay for "the sum incurred for hospitalization" of its insured.[11] Because Warden, as an Alaska Native, owed the Consortium nothing for his medical services, Warden thus claims that the Consortium could not assert a lien under state law.

The flaw in Warden's reasoning is that AS 34.35.450(a) does not specify that "the amount due the hospital" has to be due from the patient personally. The language can also be read as allowing "the amount due the hospital ... for the reasonable value of the service furnished" to mean that the hospital can recover the amount of expense it incurred from "any sum ... obtained by a settlement" with a tortfeasor or insurer.

The Consortium persuasively argues that federal law makes clear that Warden does not personally have to owe it anything for a debt to arise from his receipt of free medical services, citing the Alaska federal district court opinion in *Yukon–Kuskokwim Health Corp. v. Trust Insurance Plan of Southwest Alaska.*[12] The Yukon–Kuskokwim Health Corporation (YKHC), like the Consortium, administered health care services to Alaska Natives through operation of a hospital under a contract with the Department of Health and Human Services.[13] YKHC provided health care to Alaska Natives insured by the Trust Insurance Plan of Southwest Alaska (TIPSA), a trust composed of several southwestern Alaska employers with high numbers of Native employees that provides

---

11. Alaska Statute 34.35.450(b) provides:
   When the person receiving hospitalization has a contract providing for indemnity or compensation for the sum incurred for hospitalization, the hospital has a lien upon the amount payable under the contract. The party obligated to make reimbursement under the contract may pay the sum due under it directly to the hospital, and this payment is a full release of the party making the payment under the contract in the amount of the payment.

12. 884 F.Supp. 1360 (D.Alaska 1994).

13. *Id.* at 1362.

group insurance to those employees.[14] For reasons similar to Warden's arguments here, TIPSA routinely denied claims submitted by YKHC for services provided to those Alaska Natives. That is, TIPSA based these denials on the fact that the Alaska Natives had no legal obligation to pay for health services received from government contractors like YKHC.[15] Yet, when Congress passed the Indian Health Amendments of 1992, it "amended the Indian Health Care Improvement Act, 25 U.S.C. § 1621e(a), to expressly provide tribal organizations with a right of recovery to collect the reasonable costs of health care provided to Native Americans and Alaska Natives from third-party insurers."[16] Following passage of the amendments, YKHC filed suit against TIPSA under 25 U.S.C. § 1621e "to recover the reasonable cost of health care provided to Alaska Native TIPSA beneficiaries."[17] In upholding the retroactivity of the amendments, the district court noted that the amendments to § 1621e(a) effectively amended TIPSA's insurance policy, which had excluded coverage for medical services where Alaska Natives were not legally required to pay for the services, "by requiring assumptions that the health care recipient received care at a nongovernmental hospital, that he was required to pay, and that he had paid for the medical services."[18] The discussion of federal law in *Yukon–Kuskokwim* thus provides strong support for the Consortium's assertion that Warden did not need to have an actual "amount due."

Furthermore, the language of 25 U.S.C. § 1621e(a) quoted earlier supports the Consortium's position. Unlike AS 34.35.450(a), but very much like .450(b), that federal statute states that the Consortium, as a tribal organization, has "the right to recover the reasonable expenses *incurred* ... in providing health services ... to any individual" to the same extent as that individual or a nongovernmental health provider could receive reimbursement if "such individual had been required to pay such expenses and did pay such expenses." (Emphasis added.) Again, this language seems to clearly indicate that Warden did not have to personally owe the Consortium anything for it to have a right of recovery of the expenses it incurred in treating him.[19] We conclude that, given the federal law and decision discussed above, AS 34.35.450(a) does not require Warden to personally owe anything to the Consortium in order for the hospital to assert a lien.

Raising another federal argument, Warden attacks the validity of the lien on the ground that the Consortium seeks to be paid twice. Warden charges that the Consortium seeks to be paid once from Warden's recovery and a second time from the Indian Health Funds that paid for Warden's medical services in the first place. Warden points to 25 U.S.C. § 1621f, which provides that any reimbursements that a tribal organization recovers are retained by the organization and do not affect the amount of funding it receives from the Indian Health Service.[20]

**14.** *Id.*

**15.** *Id.*

**16.** *Id.* at 1363.

**17.** *Id.*

**18.** *Id.* at 1368.

**19.** The Consortium also makes a less convincing state law argument to support its position, pointing to AS 34.35.025, which applies to several other types of liens and which authorizes foreclosure actions against "all parties personally liable ... and all other persons interested in the matter in controversy or the property sought to be charged with the lien." The Consortium argues that this statute shows that the legislature understood the difference between defendants who are "personally liable" and those with an interest in the property and yet included both as possible

parties, and that given AS 34.35.930's call for liberal construction of the lien chapter, this means at least that the acknowledgment of different types of defendants for one group of lienholders provides an analogy for others. This other statute only shows, however, that the Legislature recognized that not all parties to lien foreclosure actions have to be "persons personally liable"; it does not establish that someone who is personally liable for the debt need not exist.

**20.** 25 U.S.C. § 1621f (2001) provides:

(a) ... all reimbursements received or recovered, under authority of this chapter, ... or any other provision of law, by reason of the provision of health services by ... a tribe or tribal organization under a contract pursuant to the Indian Self–Determination Act ... shall be retained by ... that tribe or tribal organization and shall be available for the facilities, and to carry out the programs, of ... that tribe

The Consortium counters that it is not seeking to be paid twice, since it uses the funds it recovers to replace federal grant funds that have diminished in importance as a source of financial support for the institution. The Consortium further notes that this description of its funding and its use of recovered funds, supported by affidavit, was uncontested below and relied on by the superior court in approving the Consortium's lien. We agree with the Consortium's position.

■ We conclude that the Consortium is not seeking to be paid twice; rather it is seeking to recover its costs in caring for Warden. As the Consortium convincingly argued below, the Consortium incurred expenses in treating Warden, in that portions of its federal funding were used to pay the providers who treated Warden's injuries. Furthermore, the Consortium correctly points out that 25 U.S.C. § 1621f supports its argument, as it indicates that the Consortium may seek recoveries via state tort and insurance systems and use these funds to carry out its programs.

We will next consider Warden's charge that the Consortium's lien notice was deficient and failed to conform to state law. The Consortium's lien notice contains one clause that is not in the statute, extending its lien to "any money or reimbursement due or owing or to be paid or payable under any contract providing for indemnity or compensation for sum(s) incurred for hospitalization ... from any entity or organization including Allstate Insurance Company." While this clause essentially covers circumstances in which AS 34.35.450(b) might apply, Warden alleges that the Consortium's notice erroneously extends the lien not just to a company with a contract to pay for its insured's hospitalization, as envisioned by .450(b), but also to the *tortfeasor's* insurer.

■ We determine that Warden's claim of deficient notice fails for two reasons. First, this clause is not relevant to the current case because the lien in this case is authorized under AS 34.35.450(a) and the corresponding section in the Consortium's lien notice involving recovery from settlement funds, not under AS 34.35.450(b). Second, as the Consortium argued below, its lien form is "substantially" similar to the statutory form in AS 34.35.465, which is all that is required by AS 34.35.460.

■ The last challenge by Warden we consider on the issue of the lien's validity is his claim that the Consortium cannot foreclose upon a lien against an unnegotiated settlement check. Warden argues that AS 34.35.450 provides for a lien only against settlement proceeds, whereas Allstate merely tendered a negotiable instrument promising to pay the parties.[21] Warden maintains that Allstate offered to discharge the Consortium's and Warden's demands in exchange for their acceptance of the check. But the Consortium refused to endorse the check, and Warden contends that the Alaska statutes do not provide for a lien against a promise for payment in a conditional negotiable instrument. In other words, Warden argues that "[u]ntil the check was paid there can be no lien foreclosure because there has been no payment or release to or from Warden and tortfeasor."

The Consortium counters that at the moment of settlement, Allstate was contractually obligated to fund the settlement, so no reason exists why AS 34.35.450 would not operate to attach the Consortium's lien to that obligation. The Consortium argues that it has rights to the liened funds under AS 34.35.450 whether the funds were in Allstate's account after the release was delivered but prior to the check being written, whether the settlement check was drawn but unendorsed, or whether the funds were in Rehbock's trust account.

We agree with the Consortium. Warden's argument is overly technical and unpersuasive. The settlement funds exist; they were first placed with the court and then, by stipu-

---

or tribal organization to provide health care services to Indians.
(b) The [Indian Health] Service may not offset or limit the amount of funds obligated to any service unit or any entity under contract with the Service because of the receipt of reimbursements under subsection (a) of this section.

**21.** *See* AS 45.03.104(a).

lation, endorsed and held in Rehbock's trust account pending resolution of the dispute. Allstate and Warden agreed on a settlement and release of all claims, contractually obligating Allstate to pay $24,947.22 and obliging Warden to indemnify Allstate and Copley from any suits or claims brought by holders of liens or subrogated interests to recoup medical expenses. Alaska Statute 34.35.450(a) applies to "any sum ... obtained by a settlement"; this language would cover the sum that Allstate was contractually obligated to provide in the settlement. Accordingly, we conclude that the Consortium could foreclose on its lien against the settlement.

### C. The Consortium's Suit Is Not Moot.

Although E.R. did not cross-appeal the issue of the lien's enforceability, an additional issue that arises in *E.R.* is the claim that the Consortium's health care provider lien is now moot. E.R. contends that the Consortium's appeal is against a party that no longer exists, since the "settlement funds held for or to be paid on behalf of E.R." have been disbursed in accordance with the superior court's order and are in the possession of E.R. and his custodian, who are not parties to this action. E.R. therefore argues that the Consortium can gain nothing in pursuing this appeal, since even if the Consortium prevails, there are no settlement funds in the trust account to disburse to the Consortium. And E.R. and his mother, who have the funds but are not parties, would not be bound by a decision in this appeal and would be under no obligation to turn over any portion of the personal injury proceeds to the Consortium. As such, E.R. maintains that this appeal is moot.[22]

The Consortium makes several counter arguments, the most compelling of which is that it has a right to restitution under the *Restatement of Restitution* § 74, which provides that

a person who has conferred a benefit upon another in compliance with a judgment, or whose property has been taken thereunder, is entitled to restitution if the judgment is reversed or set aside, unless restitution would be inequitable or the parties contract that payment is to be final; if the judgment is modified, there is a right to restitution of the excess.[23]

We have concluded above that the Consortium is entitled to enforce its statutory health care provider lien under federal and state law. We further determine that *Restatement* § 74 enables the Consortium's right to restitution to be given effect under a trust theory. Joyner, as trustee of the former settlement fund, must disburse to the Consortium any recovery stemming from this opinion.

### D. The Consortium's Lien Is Subject to a Pro Rata Reduction for Attorney's Fees and Costs.

#### 1. Federal and state statutes are ambiguous on the issue of a pro rata reduction of the Consortium's lien, therefore, relevant policy considerations should be applied.

We turn now to the question of whether the Consortium's health care provider lien must be reduced by a pro rata share of the patient's attorney's fees. The Consortium makes a variety of statutory arguments in attempting to establish that its lien is not subject to a pro rata reduction for attorney's fees and costs, but none of the statutes clearly prohibits such a reduction. As the New Mexico Supreme Court reasoned, the ambiguity of statutory provisions requires the court to defer to equitable considerations to determine whether to reduce the lien by a pro rata share.[24] And in *Cooper v. Argonaut Insurance*, we took equitable considerations into account in our analysis of ambiguous statutory language, looking to the probable

---

22. *See Ulmer v. Alaska Rest. & Beverage Ass'n*, 33 P.3d 773, 776 (Alaska 2001) ("A claim will be deemed moot if it has lost its character as a present, live controversy. We have further held that a case is moot if the party bringing the action would not be entitled to any relief even if it prevails.") (internal quotations and alterations omitted).

23. Restatement of Restitution § 74 (1937).

24. *Martinez v. St. Joseph Healthcare Sys.*, 117 N.M. 357, 871 P.2d 1363, 1365 (1994).

legislative intent to conclude that the statute should be read to require proration of attorney's fees to avoid unjust enrichment.

The most significant statutory argument raised by the Consortium involves AS 34.35.475. The Consortium maintains that AS 34.35.475(a)(3) directs the attorney to be paid from the gross settlement, with the remaining funds first going to satisfy liens in full and then going to the patient. Alaska Statute 34.35.475 provides:

> (a) A person or insurer is liable to a hospital, physician, or nurse, in the amount that the hospital, physician, or nurse is entitled to receive, for 180 days after the date of a payment to the injured person, the heirs of the injured person, personal representatives, or the attorney of them, when the person or insurer
>
> (1) receives a copy of notice of lien, or the lien is recorded as provided in AS 34.35.460 and 34.35.465;
>
> (2) makes the payment after receipt of notice or the recording of the lien as compensation for the injury suffered; and
>
> (3) does not pay the hospital, physician, or the licensed special nurse for the reasonable value of the services rendered to the injured person and claimed in the notice of lien, or so much of the value of the services as can be satisfied out of a judgment, settlement, or compromise, *after paying the attorney fees, costs, and expenses incurred in connection with it.*
>
> (b) The hospital, physician, or nurse has a cause of action, during the 180 days, against the person or insurer.

(Emphasis added.) The purpose of this statute, as the Consortium admits, is to provide for continuing liability against persons or insurers if, after receiving notice of a hospital lien, they have paid the injured person for that person's injuries but the hospital lien goes unsatisfied.[25]

The Consortium interprets the emphasized language in AS 34.35.475 above as implying that the attorney will pay himself off the top of the gross settlement, therefore preventing a claim by the client against a nonclient for a pro rata reduction. In *E.R.*, the Consortium notes that the gross settlement was $95,000, which is enough for attorney's fees ($31,666), costs ($9,261.16), the Consortium's lien ($30,081.65), and $23,991.19 remaining for E.R.

However, in *Cooper*, we determined that similar language in AS 23.30.015(g)—dictating that an employee shall pay to its employer out of any third-party recovery all amounts paid by the employer or the workers' compensation carrier "insofar as the recovery is sufficient after deducting all litigation costs and expenses"—could be construed in two divergent ways: (1) requiring a deduction from the amount reimbursed to the employer for litigation expenses attributable to its share of the recovery, a pro rata reduction, or (2) requiring a deduction of all litigation expenses from the total recovery with the remainder going to reimburse the employer.[26] We acknowledged that "grammatically the disputed phrase lends itself more to the second construction," but held that "the first alternative more accurately conforms to the legislative intent."[27] Therefore, we conclude that, given our previous decision in *Cooper*, the language of AS 34.35.475 is ambiguous.[28]

■ Upon finding the law ambiguous, we concluded in *Cooper* that the statute should be read to require proration of attorney's fees to ensure there is not unjust enrichment.[29] In a case quite similar to this one,

---

25. The Consortium maintains that the public policy in favor of settlements would be disrupted if the delegation of lien funds from an insurance carrier to the plaintiff's attorney became a source of contention. However, there will only be contention as long as there is uncertainty, which this opinion should resolve.

26. 556 P.2d 525, 526 (Alaska 1976).

27. *Id.*

28. The Consortium also cites to *Rhoad v. McLean Trucking Co.*, 102 Wash.2d 422, 686 P.2d 483, 487 (1984), a Washington workers' compensation case. However, that case not only involved an unambiguous statute, *id.* at 485, it also explicitly noted that our decision in *Cooper* provided for apportionment of fees and thus was "contrary to the rule in [Washington] that a statutory right to reimbursement is not to be diminished absent an express statutory provision." *Id.* at 487.

29. 556 P.2d at 527–28.

the New Mexico Supreme Court interpreted a statute entitling a hospital that provided services to an accident victim "to assert a lien upon that part of the judgment, settlement or compromise going, or belonging to such patient, less the amount paid for attorneys' fees, court costs and other expenses necessary thereto in obtaining the judgment, settlement or compromise."[30] New Mexico's statute thus contains language similar to that of AS 34.35.475. Because the court determined that the statute was "silent on the issue of apportionment of expenses to the lienholder," the court looked to the relevant policy considerations to determine the most equitable result.[31] We agree with the approach followed by the New Mexico Supreme Court: Absent other evidence of legislative intent, the silence or ambiguity of statutory provisions on the issue of apportioning attorney's fees requires us to refer to equitable considerations.

The Consortium's second statutory argument involves AS 34.35.455, which also lacks clarity on the issue of apportioning attorney's fees. That statute, entitled "Limitation on extent of lien," states:

> Except as otherwise provided, a lien under AS 34.35.450—34.35.480 may not be allowed for hospitalization or the services of a physician or licensed special nurse furnished after a settlement is made by or on behalf of the person causing the injury unless the settlement is made within 20 days from the date of the injury. *A lien is not allowed for necessary attorney fees, costs, and expenses incurred by the injured person in securing a settlement, compromise, or judgment.*

(Emphasis added.) The Consortium contends that this statutory language is clear in forbidding an injured person, or that person's attorney, from making a claim on a hospital's liened funds to pay for a portion of attorney's fees and costs. The Consortium asserts that the first sentence of the statute limits the hospital's rights, while the second

speaks to the injured person. The Consortium contends that the Legislature was protecting the health care provider's rights by limiting the rights of an injured party to reduce the lien.

But the meaning of AS 34.35.455 is far from clear, as E.R. correctly notes. First, section .455 is included in article 12 of AS 34.35, which addresses liens for hospitals, physicians, and nurses; this leads one to the conclusion that whatever language is contained in that statute applies to limitations on hospital liens, not liens by injured parties. Second, the initial language of the enactment, prior to the 1963 amendment, provided that "[n]o lien shall be allowed *against* any sum for necessary attorney fees, costs and expenses incurred by the injured party in securing a settlement, compromise or judgment."[32]

E.R. argues that these facts allow for two different interpretations of AS 34.35.455, requiring us to look at the statutory language, history, and purpose.[33] The language of the previous enactment could mean what the Consortium says it does, or it is possible that the purpose of the statutory language is to limit the extension of hospital liens to the attorney's fees and costs incurred by the injured party; in other words, the statute could merely be prioritizing an attorney lien over a hospital lien. Given the language of the previous enactment, and the context, location, and title of the statute, the latter interpretation is more plausible. We determine that the statute is at best unclear, and most likely limits the Consortium's rights, not the rights of the injured parties or their attorneys.

In its third statutory challenge to a pro rata reduction of its lien, the Consortium contends that under AS 34.35.450(a) the reduction would leave its lien unsatisfied. In *Warden,* the Consortium essentially contends that a reduction in its lien, for the purpose of allowing Rehbock to pay more settlement funds to Warden, would leave the lien unful-

---

**30.** *Martinez v. St. Joseph Healthcare Sys.,* 117 N.M. 357, 871 P.2d 1363, 1365 (1994) (quoting N.M. Stat. Ann § 48–8–1 (1978)).

**31.** *Id.*

**32.** Ch. 75, § 2, SLA 1959 (emphasis added).

**33.** *Municipality of Anchorage v. Suzuki,* 41 P.3d 147 (Alaska 2002).

filled. The Consortium looks to the language of AS 34.35.450(a), which grants the hospital a lien "upon any sum ... obtained by a settlement," and argues that any settlement funds transferred from Rehbock to Warden would still be "settlement funds" subject to the lien.

The Consortium similarly argues in *E.R.* that the superior court erred in allowing a lien reduction to increase E.R.'s recovery and that Joyner cannot pay more settlement funds to his client by transferring his claim to attorney's fees and costs. The Consortium notes that AS 34.35.450(a) gives it "a lien upon any sum ... obtained by a settlement," and that any settlement funds transferred by Joyner to E.R. would therefore still be subject to the Consortium's lien. The Consortium thus essentially argues that a lien reduction would leave its lien unfulfilled and would subject Knowles, the owner of the property on which E.R. was injured, and his insurer to double liability under AS 34.35.475.

■ But in *Martinez,* the New Mexico Supreme Court has addressed and rejected a similar assertion that pro rata reduction for attorney's fees would leave the lien unsatisfied and still in effect as to the balance due:

> The Hospital's argument, however, is based on the false premise that the lien is not paid in full. The lien is satisfied from the net proceeds of the settlement or judgment pursuant to the Act. Under our holding today, the Hospital then has a responsibility to pay its proportionate amount of attorney's fees incurred in obtaining the net proceeds, either out of the net proceeds or from some collateral source. In essence, it is as if the Hospital employed an attorney to secure payment from the patient; the Hospital might recover the full amount of the payment but its net benefit would be reduced by legal fees that would not be reimbursed absent a statuto-

ry or contractual right to those fees. Thus, there is no deficiency and the lien would not remain in effect.[34]

The New Mexico court's reasoning is persuasive and applicable to both *Warden* and *E.R.* We determine that the Consortium's lien is satisfied from the net proceeds of the judgment or settlement, and the Consortium has a responsibility to pay its proportionate share of attorney's fees incurred in obtaining the net proceeds.

■ The last statutory challenge we review on the issue of a reduction of the lien by a pro rata share of attorney's fees involves a federal statute. The Consortium claims that 25 U.S.C. § 1621e(c) prohibits state law from "prevent[ing] or hinder[ing] the right of recovery of ... a tribal organization under [25 U.S.C. § 1621e(a)]," and that reducing the Consortium's lien would violate this statute.

We disagree with the Consortium. Reducing the lien would not violate the right of recovery, it would merely influence the amount that can be recovered; more accurately, it would simply require the Consortium to pay the lawyers who implemented its right of recovery.[35] As with AS 34.35.450(a), the situation is analogous to the Consortium filing suit itself, making a full recovery, and then paying its attorneys their fees—the right of recovery would not be hindered, but the attorneys must be paid for their work.

### 2. Equitable considerations allow for a pro rata reduction.

Federal and state statutes do not provide a clear answer as to whether the Consortium's statutory health care provider lien can be reduced by a pro rata share of the attorney's fees expended to acquire settlement proceeds; therefore, we follow the approach of *Cooper* and the New Mexico Supreme Court and apply equitable considerations. Rehbock and Joyner each argue that the Consortium would obtain a windfall if it recovered on its lien but received its legal services at the

---

34. 871 P.2d at 1368.

35. *See State Farm Mut. Auto. Ins. Co. v. Geline,* 48 Wis.2d 290, 179 N.W.2d 815, 820 n. 5–9 (1970) (citing to cases in other jurisdictions awarding proportionate fees because holder of subrogated interest did not participate in action but received benefit of it, including *Vignali v.*

*Farmers Equitable Ins. Co.,* 71 Ill.App.2d 114, 216 N.E.2d 827 (1966), which it described as holding that "since such expenses would have been paid by the insurer if it had initiated the action the result should have been the same even if such recovery was secured by the insured").

expense of Warden and E.R. They are thus each making what amounts to an unjust enrichment argument. Under Alaska law, to establish that pro rata reduction of the Consortium's lien is necessary to avoid unjust enrichment, Warden and E.R. must each show that (1) either they or their attorneys conferred a benefit upon the Consortium; (2) the Consortium appreciated the benefit; and (3) it would be inequitable for the Consortium to accept and retain the benefit without paying Rehbock or Warden the value thereof.[36]

At times, the Consortium implies that Rehbock and Joyner conferred no benefit upon it—"all that Rehbock offered the Consortium was the opportunity to litigate the Consortium's lien with *him* at the same time that Rehbock was defending his claim to have rendered legal services to the Consortium." "[The Consortium] only got any money from Joyner by litigating against him." The Consortium points our attention to the fact that "after eight months of disputing [the Consortium's] lien, Joyner then claimed to have benefited [the Consortium]."

We conclude that the Consortium's argument is misplaced. If the Consortium felt burdened by the litigation dispute over the validity of the lien, it could have moved for Civil Rule 82 attorney's fees once it prevailed on that issue. But the litigation expenses that the Consortium incurred while defending the lien do not negate the labor and funding that Rehbock and Joyner contributed in asserting a cause of action against the third-party tortfeasors. The benefit conferred was that the Consortium did not pay anything for the legal services Rehbock and Joyner rendered in securing the funds that would be used to satisfy the Consortium's

lien. Rehbock and Joyner thus each benefited the Consortium, and the Consortium appreciated those benefits. We must next consider whether it would be unjust to allow the Consortium to benefit without paying for its share of the legal fees and costs.

As noted above, in *Cooper v. Argonaut Insurance Cos.*, we interpreted a workers' compensation statute with language similar to AS 34.35.475 to allow for a pro rata reduction for attorney's fees and costs.[37] Part of our reasoning was that the Legislature did not intend "the employer's compensation carrier to secure a windfall profit at the employee's expense," noting that "when the carrier recovers from a third-party tort-feasor as a result of the employee's suit, the recovery is an unexpected return because the premium paid by the employer is normally based on a projected injury loss without regard to possible third-party claims."[38] We declared that requiring an employer or compensation carrier to pay its pro rata share for the recovery of the unexpected funds prevents "the entire burden of the litigation [from being] borne by the employee. The carrier would take the benefit of both the employer's premium and the employee's litigation effort. This would result in the carrier's unjust enrichment."[39] We also cited with approval a California Supreme Court decision "requir[ing] the passive beneficiaries to bear a fair share of the costs."[40]

Rehbock and Joyner each argue that the Consortium should bear its share of the costs to prevent Warden and E.R. from incurring the full cost of recovery and letting the Consortium receive a windfall. The Consortium argues that *Cooper* is not applicable here. The Consortium maintains that *Cooper* does

---

36. *See Bennett v. Artus*, 20 P.3d 560, 563 (Alaska 2001).

37. 556 P.2d 525, 526 (Alaska 1976).

38. *Id.* at 527.

39. *Id.*

40. *Id.* at 527 n. 11 (citing *Quinn v. State*, 15 Cal.3d 162, 124 Cal.Rptr. 1, 539 P.2d 761, 764–65 (1975)). Although not addressing any equitable underpinnings, we also addressed pro rata

reductions in dicta in *Ruggles ex. rel Estate of Mayer v. Grow* 984 P.2d 509, 512 (Alaska 1999). The present case differs from *Ruggles* in that the Consortium is not an insurer and Warden was not its insured. But as argued by the attorney in the companion *E.R.* case, since Alaska Natives are entitled to free care at ANMC, the Consortium could be seen as being like an insurer in that it must bear the financial burden of providing health care notwithstanding any likelihood of recovering from third parties. *Ruggles* might thus provide additional jurisprudential support for requiring the Consortium to bear its pro rata share of fees.

not support an attorney's right to claim attorney's fees and costs from a nonparty that is claiming a hospital lien. The Consortium further notes that hospital liens have a different legislative history, purpose, and set of circumstances than workers' compensation.[41]

The Consortium's distinctions do not undermine the applicability of the reasoning of *Cooper* to this case. The issues of preventing a carrier from securing a windfall at the employee's expense, preventing the entire burden of the litigation from being borne by the injured plaintiff, preventing unjust enrichment, and requiring passive beneficiaries to share in the costs of recovery are all equitable considerations that translate well to this case. The fact that the Consortium, unlike the compensation carrier, expects to recover from third parties does not alter the equitable considerations involved in determining whether the Consortium should have to pay its share of the costs of obtaining that recovery.

Again, we conclude that the New Mexico Supreme Court decision in *Martinez v. St. Joseph Healthcare System* is instructive here. As noted above, that court interpreted a statute similar to AS 34.35.475, determined it to be ambiguous, and thus looked to the relevant policy considerations to determine the most equitable result.[42] Instead of following other jurisdictions' decisions, the New Mexico court chose to follow its own analogous rulings and so looked to a workers' compensation decision in which the New Mexico Court of Appeals "held that an employer and a worker were to apportion the legal expenses necessary to obtaining a judgment against a third-party tortfeasor," on the grounds of "fundamental fairness."[43] The court, therefore, looked to its own version of *Cooper*.

The New Mexico court concluded that "in hospital lien cases the 'common-fund' doctrine most appropriately defines the duties and liabilities of the parties and provides the most fundamental fairness."[44] The court explained:

> In hospital lien cases, the hospital's right to assert a lien, and its right to recovery based on that lien, depend by statute on the obtaining of a judgment or settlement. The proceeds of that judgment or settlement operate as a fund, and, without the fund, the hospital has nothing upon which to assert a lien under the Act. By seeking payment from the fund in reliance on the lien, the hospital directly receives the benefits of the work done by the patient's attorney. Further, as in [the Court of Appeals case], the estate bore the initial expenses and risks of litigation. Because of this, it would be fundamentally unfair to allow the Hospital to collect on its lien without paying its prorated share of the legal expenses.[45]

The New Mexico court's reasoning is again persuasive and applicable to this case.[46]

■ In the past, we have examined the common fund doctrine and its purpose of preventing unjust enrichment. The doctrine "holds that 'a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.' "[47] The doctrine "is implicated any

---

41. The Consortium points out, for instance, that workers' compensation carriers do not compute their premiums with third-party recovery in mind, as opposed to the Consortium's funding mechanism, which does. The Consortium also argues in *Warden* (without citing any support) that letting Rehbock govern the tortfeasor litigation and the settlement negotiation and management "is a Congressionally anticipated act of self-restraint on the part of its tribal health contractors. This is not conduct to be characterized disparagingly as free or easy riding."

42. *Martinez v. St. Joseph Healthcare Sys.*, 117 N.M. 357, 871 P.2d 1363, 1365 (1994).

43. *Id.* at 1366.

44. *Id.*

45. *Id.* at 1366–67 (citations omitted).

46. The only real difference is that the patient's suit was against her own insurer and not a tortfeasor's, but as already noted, the Consortium has the same right of recovery as an individual does for reimbursement, so this distinction is not meaningful.

47. *Edwards v. Alaska Pulp Corp.*, 920 P.2d 751, 754 (Alaska 1996) (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980)).

time one litigant's success releases well-defined benefits for a limited and identifiable group of others."[48] An underlying rationale of the doctrine is to prevent unjust enrichment: "As explained by the United States Supreme Court, 'persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense.' "[49]

■ We determine that application of the common fund doctrine here is appropriate for the same reasons we described in *Edwards v. Alaska Pulp Corporation:*

> The primary reasons for applying the common fund doctrine to this case are to prevent unjust enrichment and provide reasonable compensation to class counsel. In this case, the plaintiffs' lawyers created a fund that would not otherwise exist. The fund contains a specified amount, and it benefits a limited community.... Thus the doctrine allows fees to be spread among those benefited by the suit in proportion to the benefits they received. Without application of the doctrine in this case, the fund's beneficiaries would receive a clear benefit from the efforts of the plaintiffs' attorneys whose work created the fund, while those attorneys would not be sufficiently compensated. We conclude that the facts in this case give rise to the unjust enrichment or free rider concerns that the common fund doctrine is intended to address, and that application of the doctrine to this case is appropriate.[50]

Other jurisdictions have established notice and intent prerequisites for the application of the common fund doctrine as it relates to pro rata reduction of attorney's fees.[51] We decline to apply these prerequisites to the cases at hand, and instead follow the reasoning adopted by the New Mexico Supreme Court and our previous decision in *Edwards.* We conclude that it would be unfair to allow the Consortium to collect on its health care provider lien without paying a pro rata share of attorney's fees when, without the common fund created by the plaintiffs' lawyers, the Consortium would have nothing upon which to enforce its lien. The Consortium is ready and willing to take the benefits of the common fund; therefore, it must also pay a fair share of the expenses used to obtain the fund.

The Consortium disputes the relevance of the benefit it receives, claiming that both Rehbock and Joyner were "officious intermeddler[s]" who conferred "incidental benefits" on the Consortium and thus cannot appeal to claims of unjust enrichment. The Consortium also contends that because no contract existed between it and Rehbock, any benefits he conferred upon the Consortium were gratuitous and do not require restitution.[52] The Consortium maintains that Rehbock did not engage in active representation on the Consortium's behalf, but rather was working for his own client in conducting the settlement as he did, making the Consortium merely an incidental beneficiary. In support of this assertion, the Consortium cites to the Washington Supreme Court decision in *Lynch v. Deaconess Medical Center,* which held, in part, that "the fact that Deaconess eventually recovered this amount [that it was owed] is only an incidental benefit derived from Mr. Lynch's services to his client."[53]

■ We decline to follow the reasoning of the Washington Supreme Court, instead we adopt the approach of the New Mexico Supreme Court in *Martinez* which also explicitly rejected the hospital's claim that it was merely an incidental beneficiary of the lawyer's services for his client:

**48.** *Id.* at 755.

**49.** *Id.* at 754 (quoting *Boeing,* 444 U.S. at 478, 100 S.Ct. 745); *see also Municipality of Anchorage v. Gentile,* 922 P.2d 248, 267 (Alaska 1996).

**50.** 920 P.2d at 756 (footnote and citation omitted).

**51.** *See Oakley v. Fireman's Fund of Wis.,* 162 Wis.2d 821, 470 N.W.2d 882, 887 (1991); *State Farm Mut. Auto. Ins. Co. v. Geline,* 48 Wis.2d 290, 179 N.W.2d 815, 822 (1970); *In re Marriage of Meadows,* 492 N.W.2d 656, 658 (Iowa 1992).

**52.** RESTATEMENT OF RESTITUTION § 2 (1937) ("A person who officiously confers a benefit upon another is not entitled to restitution therefor."); *id.* § 112.

**53.** 113 Wash.2d 162, 776 P.2d 681, 683 (1989).

We do not agree that the benefit the hospital receives from the judgment or settlement is merely incidental. If the attorney for the patient does not secure a judgment or settlement, the hospital has nothing to which it may attach its lien. At that point, the hospital/patient relationship truly is nothing more than a creditor/debtor relationship, and the hospital must use its own legal resources to recover its funds. In contrast, if the patient's attorney secures a judgment or settlement (as the attorney did in this case), the hospital recovers money due without expending its legal resources. If we did not allow division of the legal costs, hospitals would be encouraged to sit back and reap the rewards of another's labor at that party's expense. We do not believe that is consistent with public policy in New Mexico.[54]

Distinguishing indirect beneficiaries such as mortgage holders or utility companies that are paid by customers who have secured recoveries, the court observed that "providers that have contract assignment, subrogation, or statutory lien rights ... have a recognized interest in the accumulation of a fund from a specific source and receive a direct benefit from the attorney's labor."[55] Again, we conclude that the New Mexico Supreme Court's reasoning is persuasive: The Consortium benefited directly, not incidentally.

The final policy argument we consider is the Consortium's allegation that Rehbock and Joyner committed a variety of ethical violations that should prevent them from obtaining a pro rata fee from the Consortium. We conclude that these ethical allegations lack a sound basis in both cases.

First, in *Warden*, the Consortium charges that Ethics Opinion 92–3 requires an attorney in charge of settlement funds containing a specific allocation for a third-party lien to use the amount designated to satisfy the lien. Allstate's check was "in payment of medical lien regarding David Warden for treatment provided as a result of accident on 2/15/2000," was in the exact amount of the Consortium's lien, and was made payable to the order of "Rehbock Rehbock & Wittenbrader in trust for David Warden, and ALASKA Native Medical Center." The Consortium alleges that Allstate intended the lien to be paid in full.

The Consortium further accuses Rehbock of "now claiming to be attorney for" the Consortium, of being an "unethical attorney" in "segregat[ing] the funds in the settlement to make his own claim to the funds without the nonclient's consent," and of "switching sides mid-settlement [to] structure a forced exchange." The Consortium also alleges that there is no evidence that Rehbock's fee agreement with Warden was a fee-sharing arrangement that would allow Rehbock to claim attorney's fees from the Consortium, and thus that Rehbock's attempt to do so "crosses the line marked by Rule of Professional Conduct 1.8(f); he is now demanding 'compensation for representing [another] client ... other than [the first] client.'" The Consortium cites to our previous decisions that once a conflict of interest or ethical violation is established, the attorney is prohibited from collecting fees.[56]

The Consortium's claims of ethical violations are without merit. Ethics Opinion 92–3 speaks of a "valid assignment or perfected lien" and indicates that "the attorney is obligated to withhold and segregate those funds in question" when disputes arise. Rehbock thus correctly declares that Ethics Opinion 92–3 does not suggest that an attorney must pay the full amount of a lien where there is a dispute regarding the lien's validity, amount, and susceptibility to pro rata reduction for fees, but rather simply directs the attorney to allow the court to decide the dispute. And the superior court did not err in "invading" the settlement for a reduction for fees as the Consortium alleges.

54. 871 P.2d at 1367.

55. *Id.* at 1367–68.

56. *In re Estate of Brandon*, 902 P.2d 1299, 1317 (Alaska 1995) ("In Alaska, the general rule has been that once a conflict of interest or other ethical violation has been established, the attorney is prohibited from collecting fees for his or her services.").

■ Rehbock recognizes that Rule of Professional Conduct 1.15 clearly calls for him to keep separate the disputed joint check, since the rule directs that if a dispute arises concerning the interests of an attorney and a third-party property that is in the attorney's possession, the attorney should keep the property separate. Rehbock notes that the Allstate check was payable to Warden and ANMC and thus required them to resolve their dispute as to who was entitled to how much of it. We agree with Rehbock that he handled the disputed check in accordance with the Rules of Professional Conduct. None of the Consortium's ethical allegations bear up under scrutiny.

Second, in *E.R.*, the Consortium alleges that Joyner had a conflict of interest because he was attempting to claim his own fees from the settlement funds and because an attorney acts unethically in asserting a claim to trust funds for which he or she is trustee after his or her firm has been paid in full. The Consortium also alleges that Joyner's attempt to secure additional fees for himself from the liened funds undercuts the statutory lien and goes against Rule of Professional Conduct 1.8(f), as he is now demanding "compensation for representing [another] client . . . other than [the first] client." The Consortium asserts that Joyner could have refused to advocate the lien in the settlement or could have negotiated with the Consortium (with E.R.'s consent) for the price of his advocacy, but that "[w]aiting until after settlement to claim more money is unethical." The Consortium further maintains that Joyner violated Rule of Professional Conduct 1.15(b) which requires an attorney, upon receiving funds in which a third person has an interest, to "promptly notify" that person and "to promptly deliver to the . . . third person any funds or other property that the . . . third person is entitled to receive." The Consortium advances an argument similar to the one asserted in *Warden*, citing to Alaska's general rule that once a conflict of interest or

ethical violation is established, the attorney is prohibited from collecting fees.[57]

We determine that the Consortium's claims are inaccurate for several reasons. First, Joyner was not attempting to secure more fees for himself, as his fees had already been paid; rather, he was seeking on behalf of his client to require the Consortium to reimburse E.R. for a portion of E.R.'s expenses. Second, the only basis on which the superior court appears to have found a conflict of interest was the fact that Joyner advocated the lien in the settlement and then advocated against its validity afterwards. But Joyner's position on the lien's behalf does not amount to an unethical breach. Third, Joyner properly disclosed the receipt of the funds into his trust account, gave notice that there was a dispute over the amount that the Consortium was "entitled to receive," and informed the Consortium that the funds would be held in trust until the dispute was resolved.[58] We conclude, therefore, that the Consortium's ethical allegations against Joyner are unfounded.

## IV. CONCLUSION

Because the Consortium has a federal right to enforce a statutory health care provider lien to the same extent that a nongovernmental medical provider has such a right under state law and because the Consortium would be unjustly enriched if it benefited from settlement proceeds without paying a share of the attorney's fees that created the settlement, we AFFIRM the superior court's determinations in both cases. We hold that the Consortium can foreclose on its statutory health care provider lien and that its recovery should be subject to a pro rata reduction for its share of attorney's fees and costs.

EASTAUGH, Justice, not participating.

---

57. *Id.*

58. Furthermore, even assuming that the superior court's finding of a conflict of interest were correct, the finding would not necessarily have precluded the court from wielding its equitable powers to award fees to Joyner. *See Bennett v. Artus,* 20 P.3d 560, 563 (Alaska 2001) (holding that,

even though trial court condemned conduct of attorney who had a conflict of interest, trial court could have permissibly concluded that greater inequity would result by allowing opposing party to retain benefit of attorney's uncompensated contributions).