# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### December 12, 2012 Session

## DIANE WEST, ET AL. v. SHELBY COUNTY HEALTHCARE CORP., d/b/a REGIONAL MEDICAL CENTER AT MEMPHIS.

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT-006339-07      Donna M. Fields, Judge**

---

**No. W2012-00044-COA-R3-CV - Filed February 11, 2013**

---

This is an appeal from the trial court's denial of Appellants' motion to quash Appellee's hospital liens, which were filed pursuant to Tennessee Code Annotated Section 29-22-101 *et seq*. In each Appellant's case, the hospital filed a lien and then recovered adjusted amounts for services rendered pursuant to the hospital's agreements with the Appellant's respective insurance providers. Despite having received payment, the hospital argues that it may return these adjusted payments to the insurance provider and may, instead, seek to recover its full, unadjusted bill from the Appellants' third-party tortfeasors by foreclosing its liens. We conclude that: (1) a lien, under the HLA, presupposes the existence of a debt; (2) Appellants are third-party beneficiaries of their respective insurer's service contract with the Appellee hospital; (3) having chosen to accept a price certain for services as "payment in full" and having, in fact, accepted payment from Appellants' insurance providers, the underlying debt is extinguished; (4) in the absence of an underlying debt, the hospital may not maintain its lien; (5) the right to subrogate belongs to the insurance provider and a hospital lien does not create a subrogation right in the hospital. Reversed and remanded.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and David R. Farmer, J., joined.

Eugene A. Laurenzi and Lesley Cook, Memphis, Tennessee, and A. Wilson Wages, Millington, Tennessee, for the appellants, Diane West, Jammie Heags-Johnson, and Charles Garland, Individually and on behalf of all other persons similarly situated.

John I. Houseal, Jr. and Don L. Hearn, Jr., Memphis, Tennessee, for the appellees, Shelby County Healthcare Corp., d/b/a Regional Medical Center at Memphis.

## OPINION

### I.  Overview

Diane West, Jammie Heags-Johnson, and Charles Garland (together, "Appellants") each suffered injuries and damages as a result of another person's negligent operation of a motor vehicle in separate accidents.  Each Appellant was taken, by ambulance, to Shelby County Healthcare Corporation d/b/a Regional Medical Center at Memphis (the "Med," or "Appellee"), where treatment was rendered.  The Med is a community hospital, specializing in traumatic and indigent care. According to the record, when a patient is admitted to the Med, the patient is immediately categorized in the Med's system by the nature of his or her injury (e.g., a car accident victim struck by another driver, or a pedestrian hit by another driver).  This categorization indicates whether there is any potential for third-party tortfeasor liability.  If there is potential third-party liability, then the Med files a hospital lien, pursuant to the Tennessee Hospital Lien Act, Tennessee Code Annotated Section 29-22-101 *et seq.* (the "HLA").  In the case of each Appellant, hospital liens were timely filed by the Med's collections department.  Each of the liens was filed for services rendered for the treatment of the respective Appellant's injuries in the full and unadjusted amount of each Appellant's medical bill.  In each case, Appellant's respective insurance carrier paid the Med the adjusted amount agreed upon in the contract between the Med and the insurance provider.  However, in each case, the Med refused to quash its lien against the Appellant's recovery from the third-party tortfeasor.  Rather, the Med's practice, based upon its interpretation of the applicable statutes and rules and regulations, is to consider payments from the insurance provider as "contingent payments." After the Med receives funds from the third-party tortfeasor pursuant to its hospital lien, it then reimburses the provider.  As stated in its brief, the Med interprets the applicable law to allow it to "seek payment from a third party tortfeasor even if the Med has received payment [from an insurance provider]." Specifically, in its collection practices, the Med "pursues payment for medical services from liable third party tortfeasors" by filing a hospital lien "to third party tortfeasors of the Med's rights."  The Med states that it "never keeps" the insurance payment, which is the amount agreed upon between the Med and the insurer in their contract (a/k/a, hospital services agreement).  In doing so, the Med contends that it does not charge the insured for charges beyond those covered by the insurer.  In addition to its "contingent payment" argument, the Med further argues that its right of recovery is not against the patient, but directly against the third-party tortfeasor.

Appellants' argument rests upon their contention that the Med's practice in accepting

insurance payments and, then, not quashing the lien is not in compliance with applicable law. Specifically, Appellants contend that, when the Med accepted payment from each of Appellants' insurance plans, this constituted "payment in full" for each Appellant's bill. Despite receiving "payment in full," so as to discharge the debt secured by the lien, Appellants argue that the Med is using its lien to cover billings above the adjusted amounts that it had agreed to take under its contract(s) with the Appellants' insurers–a practice referred to as "balance billing." *River Park Hospital v. Blucross Blueshield of Tennessee, Inc.*, 173 S.W.3d 43, 55-56 (Tenn. Ct. App. 2002) (defining "balance billing" as "the practice of a provider billing an enrollee for any amount charged by the provider but not paid by the [insurance plan]."), *see* further discussion *infra*.

## II. Facts

### A. Charles Garland / TennCare

Mr. Garland was treated at the Med after being injured in an automobile accident on January 2, 2006. Mr. Garland is insured by TennCare. On January 31, 2006, before TennCare had paid on Mr. Garland's bill, the Med filed an Affidavit for Hospital Lien in the amount of $1,791.22. On February 2, 2006, the Med perfected and served its hospital lien by registered mail pursuant to the HLA.

The Med has entered into a hospital services agreement (the "TennCare HMO Agreement") with Memphis Managed Care Corporation, which is a health maintenance organization ("HMO") that maintains TennCare's HMO health benefit plan on behalf of TennCare enrollees. Consistent with TennCare's "Third Party Resources" requirements, Tennessee Rules and Regulations 1200-13-1-.04,[1] 1200-13-13-.09,[2] and 1200-13-14-.09, the

---

[1] 1200-13-01-.04 THIRD PARTY RESOURCES.
(1) Definitions
(a) Third party resources shall mean any individual, entity or program that is or may be liable to pay all or part of the expenditures for medical assistance furnished to a Tennessee Medicaid recipient. Recipient resources acquired through medical malpractice or victim compensation actions or from indemnity insurance, which compensates for loss of work or loss of limb, shall not be considered a third party resource. An indemnity insurance policy which compensates for specific medical services such as inpatient hospital confinement, is a third party resource.
(b) Third party payment shall mean compensation provided to a Medical provider or to Medicaid by any third party resource which eliminates or reduces Medicaid's indebtness for medical assistance furnished to a Tennessee Medicaid recipient.
(c) Direct billing shall mean the process used by Medicaid to collect/recover payments for covered services from any third party resource

(continued...)

Med's TennCare HMO Agreement provides:

> Coordination of Benefits. Where the Enrollee is entitled to payment or benefits from multiple third-party payors, the obligations of respective third-party payors shall be determined in accordance with the coordination of benefits provisions of the applicable health benefit plans. [The HMO's] total payment under this Agreement shall not exceed that amount of compensation provided for under this Agreement, less the total of all amounts received from other payment sources.

Pursuant to this section of the TennCare HMO Agreement, the Med contends that it has used its hospital lien in an attempt to "determine the obligations of third-party payors potentially liable for Mr. Garland's medical care." TennCare, through the HMO, paid Mr. Garland's Med bill in an amount compliant with the TennCare HMO Agreement. As noted above, the Med contends that this payment was "accepted as a conditional payment that [could] be returned to TennCare upon the Med discovering the identity of or accepting payment from a liable third party tortfeasor."

Because Mr. Garland was injured by a third-party, litigation was commenced against the third-party on Mr. Garland's behalf. After TennCare paid on behalf of Mr. Garland, his

---

[1](...continued)
available to a Medicaid recipient.

[2] 1200-13-13-.09 and 1200-13-14-.09 both provide:

THIRD PARTY RESOURCES.

\*                              \*                              \*

(3) Managed Care Contractors under contract with the Tennessee Departments of Finance and Administration or Mental Health and Developmental Disabilities shall provide all third party resource information obtained from the plan's enrollees to the Bureau of TennCare on a regular basis as required by their contracts.
(4) Managed Care Contractors shall enforce TennCare subrogation rights pursuant to T.C.A. §71-5-117.

\*                              \*                              \*

(6) TennCare shall be the payor of last resort, except where contrary to federal or state law.

attorney requested that the Med release its hospital lien on the ground that the underlying debt, which was secured by the lien, had been satisfied by TennCare's payment pursuant to the TennCare HMO Agreement. The Med refused to release its lien, taking the position that it was authorized to void a claim previously paid by TennCare in an attempt to collect its payment from a third party tortfeaser. By letter of August 23, 2007, the Med informed Mr. Garland's attorney that:

> The Med is not billing Charles Garland any amount of money over and above what TennCare paid. The Med has a lien against the third party liability claim. It is the Med's position that pursuant to the lien and pursuant to the rules of TennCare, they have a right to pursue the third party liability claim up to one-third of the settlement or the amount of their bill, whichever amount is lower. If payment is made pursuant to the liens statute, the Med will reimburse TennCare for any monies that they have paid.

### B. Jammie Heags-Johnson / Baptist Health Services Group

Ms. Heags-Johnson was injured in a motor vehicle accident on July 21, 2006. Ms. Heags-Johnson is insured through an employer-sponsored health plan that is administered by Accordia Insurance Company. Accordia is part of the Baptist Health Services Group of the Mid-South, Inc.'s ("BHSG") provider network, and thus is subject to BHSG's contract with the Med (the "BHSG Network Contract").

Ms. Heags-Johnson received two bills from the Med. The first bill, in the amount of $4,302.94, was for her initial treatment. She received a second bill, in the amount of $338.24, for further treatment at the Med on August 8, 2006. On August 1, 2006, the Med filed its first hospital lien in the amount of $4,302.94; this lien was perfected by registered mail on August 3, 2006. On November 21, 2006, the Med filed an amended hospital lien in the amounts of $4,302.92 and $448.42. The amended lien was also perfected pursuant to Tennessee Code Annotated Sections 29-22-101 *et seq*.

BHSG paid Ms. Heags-Johnson's Med bill in the amounts agreed upon under the BHSG Network Contract, i.e., $2,952.96 and $216.59 for the respective bills. Ms. Heags-Johnson subsequently commenced litigation against the third-party tortfeasor, who was allegedly responsible for her injuries. When Ms. Heags-Johnson's attorney requested that the Med release its hospital lien in light of payments made by BHSG, the Med refused. A July 13, 2007 letter, in which Gary McCullough, the Med's attorney, requested payment from the third-party tortfeasor's liability carrier explains the Med's position:

The Med requests the full principal balance of $4,304.92 on [Ms. Heag-Johnson's account] from the third party liability carrier. [The Med] will then reimburse the health insurance provider for the $2,952.96 [i.e., the amount paid by BHSG under the BHSG Network Contract]. The Med also requests that on [Ms. Heag-Johnson's account], $338.42 be paid from the third party liability carrier, at which time they will reimburse the health insurance carrier $216.59.

Again the Med argues that it has not "balance billed" Ms. Heag-Johnson because the payments made by BHSG were "conditional payments" that the Med could return at any time upon discovering the identity of third-party tortfeasors. The Med also contends that it is not attempting to collect its bill from Ms. Heag-Johnson, but is attempting to collect from a liable third-party.

## C. Diane West / Blue Cross Blue Shield

Ms. West was involved in an automobile accident on July 30, 2006. She was treated at the Med and was discharged that same day. Ms. West received a bill from the Med for total charges of $14,008.97. Ms. West is a participant in an employer-sponsored health plan, which is administered through Blue Cross Blue Shield of Alabama ("BCBS"). Ms. West was admitted to the Med through the Med's Institution Agreement with BCBS of Tennessee (the "BCBS Institution Agreement.").

On August 10, 2006, the Med filed and perfected a hospital lien. Thereafter, BCBS paid $3,215.72 in settlement of Ms. West's Med bill in accordance with the BCBS Institution Agreement. Ms. West had filed a lawsuit against the third-party tortfeasor, who was allegedly responsible for her injuries. In connection with the lawsuit, and after BCBS had paid, Ms. West's attorney requested that the Med release its hospital lien. By letter of April 2, 2007, the Med responded:

I [Mr. McCollough] am advised by my client [the Med] that BlueCross BlueShield paid $3,215.72 on [Ms. West's account] on March 14, 2007. Pursuant to the Med's agreement with BlueCross BlueShield, they have the right to pursue the third-party lien rights up to the amount of the bill. In the event more than $3,215.72 is collected on this account, pursuant to the lien, the Med will reimburse BlueCross BlueShield.

The Med argues that the BCBS Institution Agreement expressly provides that the Med

is not precluded from collecting funds due the Med from third-party tortfeasors.

### III.  Disposition in the Trial Court

On December 26, 2007, the instant lawsuit was commenced as a class action suit to quash the Med's hospital liens and for damages.[3] The case was briefly removed to federal court, but ultimately Appellants filed a second amended complaint (the "Complaint") to quash the hospital liens and for damages in the Shelby County Circuit Court on February 9, 2010.  In relevant part, the Complaint avers:

> Despite the payment from [the Appellants' respective insurance providers] and [the Med's] acceptance of said monies as payment in full, [the Med] takes the position that pursuant to the hospital lien statute, it is entitled to a greater amount out of the proceeds from the settlement of [the Appellants' respective] injury case[s] that arise[] out of [their] automobile accident[s].
> . . .
>
> e.  In an effort to capture additional revenue, The Med has implemented a systematic and continuous policy of "balance billing" patients whose medical care and services are reimbursed by [insurance providers]. . . .
>
> f. [Insurance providers] generally pay[] reduced rates for. . .medical services [provided to the insured person]. . . .
>
> g.  In return for accepting reduced rates from. . . healthcare providers, such as The Med, are assured of being reimbursed the negotiated amount for the medical services rendered.  Being able to collect fees for medical services, albeit at a reduced rate, allows the Med to avoid filing hospital liens, or pursuing other types of legal remedies, to collect fees from lower income patients who lack the ability to pay the full reasonable fee charged by The Med.  In exchange for the absolute assurance of being paid for their medical services. . .The Med is required to treat [the negotiated payments] as *payment in full* for services rendered . . . .

---

[3] It is unclear from the record whether a class was ever certified.

h. The Med has implemented a system of "balance billing" . . .patients by filing a Hospital Lien after the patient has been treated and The Med has received proper. . .reimbursement [from the patient's insurance provider]. The amount of the lien reflects the full and total cost, not the reduced. . .rate[] of medical services provided by The Med to the patient. Filing a Hospital Lien for a patient enrolled in TennCare [or covered by other insurance] is permissible. . .provided that the hospital or medical facility releases the lien once they have been reimbursed by [the insurer]. However, The Med has sought to collect the outstanding difference between the amount reimbursed by [the insurer], and the total amount billed for services, by seeking to enforce the Hospital Lien *after* being reimbursed for medical expenses by [the insurer]. This practice is a consummate example of unlawful "balance billing."

(emphases in original).

Following discovery, on May 18, 2010, Appellants filed a motion to quash the Med's hospital liens on the ground that the Med's collection practices are illegal. Therein, Appellants further aver that:

Each lien was filed subsequent to [Appellants'] treatment at The Med after sustaining injuries from third parties. In every case [Appellant's] health insurance carrier paid the Med pursuant to their contract with the Med. "Adjustments" were made by the Med's billing office and in each case the "account balance" was zero or a small co-pay balance remain[ing]. Because the account balances were paid each [Appellant] requested the Med release its lien. Even though the Med was paid in full pursuant to agreements with [Appellants'] health carriers the Med, through counsel, refused to release their liens. Instead the Med, as it has done with thousands of it[s] patients, demanded 1/3 of [Appellants'] recovery from third party tortfeasors. If the total charges in the Med's bill was less than 1/3 of the recovery the Med demanded payment of the full bill even though the bill has been paid.

Appellants further aver that Mr. McCollough instructed the Med not to release Appellants' full medical bills. Rather, Appellants state that the Med "would only release the

first part of the bill evidencing the patient's total charges." Moreover, Appellants aver that "the Med's counsel also refused to provide documentation [i.e., BHSG Network Contract, TennCare HMO Agreement, and the BCBS Institution Agreement] . . . which would allow [Appellants] to make a determination whether the contract between the Med and [the insurer] allowed the Med to engage in this type of collection practice." The record reveals that Appellants filed numerous requests for the Appellants' full medical bills and for the relevant hospital services agreements. The Med ultimately provided the full medical bills, which state, in relevant part, as follows:

- **Diane West's Bill**— Shows itemized charges totaling $14,008.97. Page three [i.e., the portion of the bill that was allegedly withheld] indicates "Adjust/Payment/Refund" as follows:

  | | |
  |---|---|
  | ADJ BC PREFERRED | [$]–10793.25 |
  | RCP Blue Cross Preferred | [$]–3215.72 |
  | | -[$]14008.97 |

  Account Balance:  0.00

- **Charles Garland's Bill**— Shows itemized charges totaling $1,791.22. Page three [i.e., the portion of the bill that was allegedly withheld] indicates "Adjust/Payment/Refund" as follows:

  | | |
  |---|---|
  | ADJ TennCare Select | [$]–1649.70 |
  | RCP Blue Cross Preferred | [$]–142.22 |
  | | –[$]1791.22 |

  Account Balance:  0.00

- **Jammie Heag-Johnson's First Bill**— Shows itemized charges totaling $4,304.92. Page three [i.e., the portion of the bill that was allegedly withheld] indicates "Adjust/Payment/Refund" as follows:

ADJ Other Insurance Primary      [$]–880.98
RCP Other Insurance Primary      [$]–<u>2952.96</u>

                              –[$]3833.94

              Account Balance:      0.00

- **Jammie Heag-Johnson's Second Bill**— Shows itemized charges totaling $338.42. Page three [i.e., the portion of the bill that was allegedly withheld] indicates "Adjust/Payment/Refund" as follows:

  ADJ Other Insurance Primary      [$]–67.68
  RCP Other Insurance Primary      [$]–<u>216.59</u>

                          –[$]284.27

          Account Balance:      $54.15

On September 22, 2010, the Med filed a response in opposition to Appellants' motion to quash. Therein, the Med asserts that it does not "balance bill" its patients. Rather, the Med contends that its practice is "only taken to seek payment from responsible third party tortfeasors." The Med argues that the Appellants "clearly mischaracterize the Med's pursuit in the collection of expenses from third parties as a pursuit from the patient." In addition, the Med states that Appellants "fail to understand the unambiguous agreements between the Med and various health payers." Concerning Mr. Garland, a TennCare enrollee, the Med cites Tenn. R. & Reg. 1200-13-1-.04(17)(d) for the proposition that the Med "may void a claim paid by TennCare <u>at any time</u> to recover a larger payment from a third-party tortfeasor." Pursuant to the cited Regulation, the Med contends that "TennCare has intentionally delegated to providers the ability to recover TennCare payments on its behalf and, therefore, asserts its role as the 'payor of last resort.'" In other words, the Med argues that it must take measures to subrogate any payments made by the insurance provider. Concerning Diane West, a BCBS enrollee, the Med cites the 2002 addendum to the BCBS Institution Agreement, which provides:

> Nothing in this BCBST Agreement, including the [Med's] Agreement to accept amounts received under this Agreement as payment in full from BCBST for all covered services or the

[Med's] promise to hold BCBST Member's harmless for the cost of coverage of services except for any co-payments, co-insurance and deductible, shall preclude any collection efforts by the [Med] to collect appropriate amount(s) due the [Med] from a third party that might have legal responsibility for the services rendered.

Pursuant to the contractual language, the Med contends that its billing practice is "simply [an attempt] to pursue its rights against the third party responsible for Ms. West's medical care." Concerning Ms. Heag-Johnson, a BHSG enrollee, the Med argues that nothing in the BHSG Network Contract "prohibits the Med's attempt to recover funds from liable third parties." In Ms. Heag-Johnson's case, the Med specifically "served its hospital lien . . . upon State Farm Insurance Company, the insurer for the liable third party tortfeasor." In short, the Med argues that the HLA and the respective hospital services contracts specifically support its billing practice. The Med contends that the Appellants ignore "[t]he distinction and legal effect between 'balance billing'. . . and seeking reimbursement from a third-party tortfeasor." Contemporaneous with its response, the Med filed the Affidavit of Judy Briggs, the Executive Director of Revenue Cycle for the Med, and the Affidavit of Mr. McCollough in support thereof.

The trial court heard oral argument on September 27, 2010, but reserved ruling on the motion to quash the hospital liens. On October 6, 2010, the Med filed a supplemental response in opposition to the Appellants' motion to quash the liens; on October 14, 2010, Appellants filed a reply to the Med's supplemental response. Supplemental briefs and responses were then filed by both sides.

A second hearing was held on September 7, 2011. On November 4, 2011, the court entered an order denying Appellants' motion to quash the hospital liens. Appellants filed a notice of appeal on December 1, 2011. Upon review of the record, this Court determined that the November 4, 2011 order was not final and entered a show cause order, on June 12, 2012, requiring Appellants to obtain a final judgment in the trial court. In response, the Appellants supplemented the record with an amended order, which was entered in the trial court on June 11, 2012. Upon review, the amended order appears to be a final, appealable order. The amended order provides, in pertinent part, as follows:

> The Court finds that the facts contained in the Affidavit of Judy Briggs filed September 22, 2010 and the Affidavit of Gary McCullough filed September 22, 2010 are true and accurate, including, but not limited to, the following:

(1) The Med pursues payment for medical services from liable third party tortfeasors;

(2) The Med always returns and voids payments made by TennCare or a private health plan payor either before or after receipt of payment from a liable third party;(3) The Med never keeps both the TennCare or private health plan payor payment and the payment received from liable third party tortfeasor;

(4) In all cases where the Med recover's payment from a third party tortfeasor, the Med returns any and all payments made by TennCare to TennCare or a private health plan payor to the private health plan payor.

The Court holds that the Med's actions are authorized by TennCare's Rules and Regulations and by the Med's Institution Agreement with Blue Cross and Blue Shield of Tennessee except as to Blue Cross Blue Shield of Tennessee when they request release of said lien provided for in Amendment 1 attached hereto as Exhibit "A", both of which were submitted to and considered by the Court.

## IV. Issue and Applicable Standards of Review

### A. Issue

The sole issue for review, as stated by Appellants in their brief, is:

Whether Tennessee's Hospital Lien Act, Tenn. Code Ann. §29-22-101 *et seq*., permits a hospital to enforce a hospital lien claiming one-third (1/3) of an individual's personal injury settlement after the hospital accepted payment from an individual's health insurance carrier as "payment in full," creating a zero balance with the hospital and extinguishing the lien.

Because this case was tried by the court, sitting without a jury, this Court conducts a *de novo* review of the trial court's decision with a presumption of correctness as to the trial court's findings of fact, unless the evidence preponderates against those findings. *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn.

Ct. App. 1999). This Court reviews the trial court's resolution of legal issues without a presumption of correctness. *Johnson v. Johnson*, 37 S.W.3d 892, 894 (Tenn. 2001).

## B. Statutory Construction

To the extent that this issue requires us to interpret, harmonize, and apply various statutory provisions and regulations, it presents a question of law, which we review *de novo* with no presumption of correctness. Tenn. R. App. P. 13(d). The Tennessee Supreme Court recently outlined the applicable principles that apply to the question of statutory interpretation:

> When dealing with statutory interpretation . . . our primary objective is to carry out legislative intent without broadening or restricting the statute beyond its intended scope. *Houghton v. Aramark Educ. Res., Inc.*, 90 S.W.3d 676, 678 (Tenn. 2002). In construing legislative enactments, we presume that every word in a statute has meaning and purpose and should be given full effect if the obvious intention of the General Assembly is not violated by so doing. *In re C.K.G.*, 173 S.W.3d 714, 722 (Tenn. 2005). When a statute is clear, we apply the plain meaning without complicating the task. *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004). Our obligation is simply to enforce the written language. *Abels ex rel. Hunt v. Genie Indus., Inc.*, 202 S.W.3d 99, 102 (Tenn. 2006).

*Estate of French v. Stratford House*, 333 S.W.3d 546, 554 (Tenn. 2011). Furthermore, statutes that are part of a broad statutory scheme should be interpreted *in pari materia*, so as to make that scheme consistent in all its parts. *Wells v. Tennessee Bd. of Regents*, 231 S.W.3d 912, 917 (Tenn. 2007); *Lyons v. Rasar*, 872 S.W.2d 895, 897 (Tenn. 1994); *State v. Allman*, 68 S.W.2d 478, 479 (Tenn. 1934). Courts are required to construe a statute, or set of statutes, "so that the component parts are consistent and reasonable." *In re Sidney J.*, 313 S.W.3d 772, 775 (Tenn. 2010) (quoting *Cohen v. Cohen*, 937 S.W.2d 823, 827 (Tenn. 1996)). We also have a duty to interpret a statute in a manner that makes no part inoperative. *In re Sidney J.*, 313 S.W.3d at 775–76 (citing *Tidwell v. Collins*, 522 S.W.2d 674, 676 (Tenn. 1975)). Moreover, courts are bound to apply the remedy prescribed by the Tennessee General Assembly, and may not depart from that remedy. *Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.2d 528, 536 (Tenn. 2002) ("If a statute creates a new right and prescribes a remedy for its enforcement, then the prescribed remedy is exclusive.") (quoting *Hodges v. S.C. Toof*, 833 S.W.2d at 896, 899 (Tenn. 1992)).

### C. Contract Interpretation.

To the extent that the issue requires us to interpret the hospital services agreements between the Appellants' insurance providers and the Med, this is also a question of law. **Guiliano v. Cleo, Inc.,** 995 S.W.2d 88, 95 (Tenn. 1999). Therefore, the trial court's interpretation of a contract is not entitled to a presumption of correctness on appeal. **Allstate Insurance Company v. Watson**, 195 S.W.3d 609, 611 (Tenn. 2006); **Angus v. Western Heritage Ins. Co.**, 48 S.W.3d 728, 730 (Tenn. Ct. App. 2000). "This Court must review the document ourselves and make our own determination regarding its meaning and legal import." **Hillsboro Plaza Enters. v. Moon**, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993).

"The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern." **Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.**, 78 S.W.3d 885, 890 (Tenn. 2002). "The court's role in resolving disputes regarding the interpretation of a contract is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the language used." **Allstate Ins. Co.**, 195 S.W.3d at 611; **Staubach Retail Services–Southeast LLC v. H.G. Hill Realty Co.**, 160 S.W.3d 521, 526 (Tenn. 2005); **Bob Pearsall Motors, Inc. v. Regal Chrysler–Plymouth Inc.**, 521 S.W.2d 578, 580 (Tenn. 1975). However, to the extent that a conflict arises between a statute and a provision in the contract, the statute will prevail. **Fleming v. Yi**, 982 S.W.2d 868, 870 (Tenn. Ct. App. 1998) (citing **Dunn v. Hackett**, 833 S.W.2d 78, 82 (Tenn. Ct. App. 1992)).

### V. Analysis

In this case, Mr. Garland is a TennCare enrollee. Ms. West is a BCBS enrollee and Ms. Heags-Johnson is a BHSG enrollee. In each case, the Med's lien was taken pursuant to the HLA. In the case of Ms. West and Ms. Heags-Johnson, this Court must apply the HLA in harmony with the hospital service agreements in place between the Med and BCBS and BHSG. Mr. Garland's case is more complex in that it requires us not only to harmonize the HLA with the contract between the Med and the TennCare HMO, but also to harmonize the HLA with certain federal mandates and with certain Tennessee Rules and Regulations applicable to the Tennessee Department of Finance and Administration in its administration of TennCare. We begin with the language of the HLA.

### A. Relevant provisions of the HLA, which are applicable to each Appellant.

#### a. Tennessee Code Annotated Section § 29-22-101. General provisions:

(a) Every person, firm, association, corporation, institution, or any governmental unit, including the state of Tennessee, any county or municipalities operating and maintaining a hospital in this state, shall have a lien for all reasonable and necessary charges for hospital care, treatment and maintenance of ill or injured persons upon any and all causes of action, suits, claims, counterclaims or demands accruing to the person to whom such care, treatment or maintenance was furnished, or accruing to the legal representatives of such person in the case of such person's death, on account of illness or injuries giving rise to such causes of action or claims and which necessitated such hospital care, treatment and maintenance.

(b) The hospital lien, however, shall not apply to any amount in excess of one third (1/3) of the damages obtained or recovered by such person by judgment, settlement or compromise rendered or entered into by such person or such person's legal representative by virtue of the cause of action accruing thereto.

The HLA grants Tennessee hospitals an unqualified right to collect their bills from any recovery available to a patient related to his or her injuries. The overt purpose of the Tennessee hospital lien statute is to ensure that hospitals are paid from third party sources responsible for payment on behalf of the patient treated. Op. Tenn. Att'y Gen. 94-067 (May 13, 1994); *see* **Martino v. Dyer**, No. Ml 999-02397-COA-R3-CV, 2000 Tenn. App. LEXIS 764 at *6 (Tenn. Ct. App. November 22, 2000) (citing with approval Op. Tenn. Att'y Gen. 94-067 (May 13, 1994)). The HLA creates a lien in favor of Tennessee hospitals on any third party recoveries by a patient, specifies perfection by timely filing of such lien, provides for constructive notice to all liable third parties by such filing, and creates a right of action for the hospital against any third parties that fail to honor the requirements of Tennessee law, in which action a Tennessee hospital may recover the reasonable amount reflected upon the hospital lien.

As set out above, the statute begins with an expansive mandate. Tennessee hospitals have a lien for "all reasonable and necessary charges for hospital care, treatment and maintenance" of patients, upon "any and all causes of action, suits, claims, counterclaims or demands" of the patient, "on account of illness or injuries giving rise to such causes of action or claims, and which necessitate such hospital care[.]" Tenn. Code Ann. § 29-22-101 (a). The statute then allows the injured patient some level of monetary recovery, by limiting the amount of a hospital lien applicable to the patient's recovery to one-third of any "judgment, settlement or compromise rendered or entered into by" the patient. *Id*. § 29-22-101(b).

Section 102(a) of the HLA sets the requirement for perfection of a hospital lien. A hospital lien is perfected by filing. Specifically, in order to perfect the lien, the hospital shall file the lien in the "office of the clerk of the circuit court of the county in which the hospital is located" within 120 days of the patient's discharge. *Id*. § 29-22-102(a). The hospital is to file a verified statement of "the amount claimed to be due for such hospital care" and include names and addresses of those the hospital knows the patient has claimed to be liable for any "damages arising from such illness or injuries." *Id*. Section 29-22-102(c) establishes constructive notice to the world by the filing of the hospital lien. The statute clarifies that, as to any potential third party source of funds, the "filing of the claim shall be notice . . . whether or not they are named in the claim or lien and whether or not a copy of the claim shall have been received by them." *Id*. § 29-22-102(c). Parties that wish to contest the lien, or the reasonableness of the verified charges thereon, may do so by filing a motion with the circuit court in the county where the lien was filed, and should serve all parties with an interest in the subject matter. *Id*. § 29-22-102(d).

A hospital has thirty days to file the lien and obtain relation back to the date of discharge of the patient. While any payment made by "an insurance carrier" on a "claim filed by a policyholder or other person against such carrier" prior to the filing of the lien does not "create any additional liability on the part of the insurance carrier . . . paying the claim[,]" this provision, i.e., Tennessee Code Annotated Section 29-22-102(e), does not apply until thirty days after the patient's discharge from the hospital. Tenn. Code Ann. § 29-22-102(e)(1), (2).

> **c. Tennessee Code Annotated Section 29-22-104. Impairment; damages**:
>
> (a) No release or satisfaction or any action, suit, claim, counterclaim, demand, judgment, settlement or settlement agreement, or any of them, shall be valid or effectual as against such lien unless the lienholder shall join therein or execute a release of the lien.
>
> (b)(1) Any acceptance of a release or satisfaction of any such cause of action, suit, claim, counterclaim, demand or judgment and any settlement of any of the foregoing in the absence of a release or satisfaction of the lien referred to in this chapter shall prima facie constitute an impairment of such lien, and the lienholder shall be entitled to an action at law for damages on account of such impairment, and in such action may recover from the one accepting such release or satisfaction or making

-16-

such settlement the reasonable cost of such hospital care, treatment and maintenance.

(2) Satisfaction of any judgment rendered in favor of the lienholder in any such action shall operate as a satisfaction of the lien.

(3) Any action by the lienholder shall be brought in the court having jurisdiction of the amount of the lienholder's claim and may be brought and maintained in the county of residence of the lienholder.

**d. Tennessee Code Annotated Section 29-22-105 Release; fees**:

(a) To release a perfected lien as described under this chapter, the operator of the hospital to whom the lien has been duly paid shall execute a certificate to the effect that the claim filed by such hospital for treatment, care and maintenance therein has been duly paid or discharged and authorizing the clerk in whose office the notice of hospital lien has been filed, to release the same, such release to be at the expense of the hospital.

**e. Tennessee Code Annotated Section 29-22-106 Settlement; claimants not named in instruments**:

No person, firm, or corporation, paying a claim, demand, or judgment shall include the name of any lien claimant, under this chapter, as a payee on any drafts or checks issued to settle such claims, demands, or judgments.

**f. Tennessee Code Annotated Section 29-22-107 Hospitals**:

This chapter shall not be construed as giving any hospital an independent right of action to determine liability for injuries sustained by any person covered herein nor shall any settlement or compromise of a claim entered into on behalf of such person require the approval of the hospital.

There is no contention here that the Med's liens were improperly filed under the HLA.

Therefore, the only question is whether they were barred by some other authority.

## B. Propositions Common to all Appellants

Some courts have held that, by its terms, the HLA creates a "statutory nonpossessory lien." *See Mercy Hospital & Medical Center v. Farmers Ins. Group of Companies*, 932 P.2d 210 ( Cal. 1997). In other words, the lien is "nonconsensual" and "compensates a hospital for providing medical services to an injured person by giving the hospital a direct right to a certain percentage of specific property, i.e., a judgment, compromise, or settlement, otherwise accruing to that person." *Id*. at 211.

Because a lien under the HLA is statutory, "[t]he Legislature is . . . free to define and limit such a lien . . . ." *Mercy Hospital*, 932 P.2d at 214. As such, the first question we address is whether such a lien requires an underlying debt owed by the patient to the hospital. We begin with the statutory language. As set out above, the HLA specifically states that the lien is only against the cause of action and shall not be a lien against the injured person. The statute, however, does not expressly state whether it requires the existence of a debt to support the enforcement. However, the statute expressly creates a "lien."

"Lien" is defined as "[a] legal right or interest that a creditor has in another's property, lasting [usually] until a debt or duty that it secures is satisfied." Black's Law Dictionary 1006 (9th ed. 2009). The term "lien," in a narrow and more technical sense, signifies the right by which a person in possession of personal property holds and detains it against the owner in satisfaction of a demand; but it has a more extensive meaning, and in common acceptance is understood and used to denote a legal claim or charge on property, either real or personal, for payment of any debt or duty. A lien is defined to be a hold or claim which one has upon the property of another as security for some debt or charge. *See, e.g., Shipley v. Metropolitan Life Ins. Co.*, 158 S.W.2d 739 (Tenn. Ct. App. 1941).

The proposition that a lien presupposes the existence of a debt is deeply rooted in our jurisprudence. As discussed in 51 Am.Jur.2d Liens § 13 (2011):

> As a lien is a right to encumber property until a debt is paid, it presupposes the existence of a debt. If there is no debt in the first instance, there is no need for a lien, so a lien cannot legally exist or attach. In other words, without a debt, there can be no lien.
> Although a lien is an incident of, and inseparable from, the debt it secures, it is distinct from that debt; liens relate to assets or collateral, while the indebtedness underlying a lien

appertains to a person or legal entity (the debtor).

*Id*. (footnotes omitted).  From the statutory language, we conclude that the Legislature intended to give a lien, under the HLA, the same characteristics as a typical lien, the ordinary definition of which requires a debt to support it.  We now turn to address the question of "debt" in the context of the HLA and specifically the question of who owes the debt as between the patient and the third-party tortfeasor.

In its statements from the bench, it is apparent that the trial court concluded that the debt for hospital services is against the third-party tortfeasor and not the patient:

> MR. LAURENZI [attorney for Appellants]: . . . [w]hat I would ask the Court to do is to rule whether or not the hospital has a lien against the patient or against the insurance company. . . .
>
> THE COURT: I think the lien is against the third-party tortfeasor, whether or not they have insurance.
>
> MR. LAURENZI: Judge, I respectfully think it's against the patient. . . . I think the statute makes clear that it's against the patient.
>
> THE COURT: In [*Shelby County  Health Care Corp., v.*] *Baumgartner*[, No. W2008-01771-COA-R3-CV, 2011 WL 303249 (Tenn. Ct. App. Jan. 26, 2011)] on Page 12, the Supreme Court of our state has said Tennessee's HLA was adopted in 1970 in order "to create for hospitals a lien upon all causes of action for damages accruing to persons having received care and treatment for illness or injuries and to provide the procedure for perfecting, recording, enforcement, and release of such lien."  Closed quote.  They're citing [*Shelby County Health Care Corp., v.*] *Nationwide* [*Mut. Ins. Co.*, 325 S.W.3d 88 (Tenn. 2010)].[4]  I said to you just now I understand

---

[4] The *Nationwide* Court specifically stated:

> In enacting this legislation, the legislature indicated that the purpose of this [HLA] is to create liens for hospitals to ensure that hospital bills are paid. The legislature recognized that hospitals were losing funds from providing care to individuals who later collected a settlement or judgment for their

(continued...)

-19-

what [Mr. Houseal] says it includes. I also understand in practice where that effect, the loss of funds, will be and that means it will fall upon the patient, but that is not what the law says or provides.

With respect to the trial court, its conclusion that a hospital lien is against the patient's third-party recovery, and not against the patient directly, is a more complex question than the trial court supposes. We begin with the definition of "debt." The first definition Black's offers for "debt" is "[l]iability on a claim; a specific sum of money due by agreement or otherwise." Black's Law Dictionary 410 (7th ed. 1999). Accordingly, as soon as the Med began to treat the Appellants, such a debt came into being, i.e., "a specific sum of money became due" by virtue of the medical services rendered. *Cf. Alaska Native Tribal Health Consortium v. Ridley*, 84 P.3d 418, 425 (Alaska 2004) (holding that a healthcare provider could enforce a lien on settlement proceeds between a patient and third-party tortfeasors even when the patient was not personally indebted to the provider because the patient was entitled to free medical care). The maxim that services rendered give rise to a debt is as old and universal as the maxim that a lien presupposes a debt. As a general matter, the rule applies with equal force in the medical context. *See, e.g., Cates v. Gilmer*, 48 S.W. 280 (Tenn. Ct. App. 1898) (recognizing that an implied contract arises for the reasonable value of nursing services rendered); *see also* 40A Am. Jur. 2d Payment for Services Provided by Hospital, § 8 (2011) ("Health care providers and their patients stand in a creditor-debtor relationship. Indeed, a hospital ordinarily is entitled to be compensated for its services, by either an express or an implied contract, and if no contract exists, there is generally an implied agreement that the patient will pay the reasonable value of the services rendered.").

We conclude that the language of the statute contemplates that the underlying debt to which the lien attaches is an obligation owed by the person receiving medical services from the hospital. The statute does not give the hospital an independent cause of action against the third party tortfeasor. Tenn. Code Ann. §29-22-107. Instead, it authorizes the hospital to attach a lien "for the reasonable and necessary charges for hospital care, treatment and maintenance of . . . injured persons" and states that the lien shall be "upon any and all causes of action . . . accruing to the person to whom such care . . . was furnished . . . on account of . . . injuries giving rise to such causes of action and which necessitated such hospital care .

---

[4](...continued)
injuries but failed to pay their hospital bills. The legislature noted that this Act would help keep hospital costs down by setting up an orderly method for the establishment of liens on such settlements or judgments.

*Nationwide*, 325 S.W.3d at 93 (quoting Tenn. Att'y Gen. Op. No. 94-067 (May 13, 1994) (citations omitted));

. . ." Tenn. Code Ann. §29-22-101(a). The lien seeks to compensate the hospital for services provided to the patient; thus, the use of the term "charges" presumably refers to the charges incurred and made to the patient or his health insurer. *See Parnell v. Adventist Health System/West*, 109 P.3d 69 (Cal. 2005). Additionally, the lien statutes require the hospital to give notice to the patient. *See* Tenn. Code Ann. §29-22-102. At its most basic level, the HLA recognizes that a hospital is entitled to directly bill the patient for its services and to rely solely on the patient to pay for medical services rendered, *see* further discussion *infra*. To ensure payment to the hospital, the statute grants the hospital a lien against a patient's cause of action. This cause of action refers to the patient's recourse against a tortfeasor for causing the patient's injuries. This recourse is represented by a claim brought against a tortfeasor for personal injuries and associated economic damages, such as a hospital bill. In turn, the tortfeasor, where insured, may look to his insurance company to make liability payments to the patient to cover the patient's economic damages. These liability payments, in turn, are subject to the hospital's lien seeking reimbursement for services directly billed to the patient. The lien allows the hospital to step into the shoes of the insured for purposes of receiving payment from the tortfeasor's insurance company for economic damages represented by the hospital bill. Based on the clear language of the statute and the focus on the patient, we conclude that the debt owed by the patient to the hospital is the foundation of the hospital's lien right.

Although our research has revealed that this conclusion is favored by the majority of jurisdictions who have considered the issue, as discussed in a later section, we are aware that not all courts have reached the same conclusion. *See, e.g., Alaska Native Tribal Health Consort. v. E.R.* 84 P.3d 418 (Alaska 2004) (allowing a lien despite the fact that the patient did not owe a debt because of the specific federal law at issue in the case); *Andrews v. Samaritan Health System*, 36 P.3d 57, 61 (Ariz. Ct. App. 2001), disapproved on other grounds in *Blankenbaker v. Jonovich*, 71 P.3d 910 (Ariz. 2003) (allowing the hospital to maintain a lien after receiving payment in full from the insurer, when the contract between the hospital and the insurance provider contained a "recapture" clause); *Rogalla v. Christie Clinic*, 794 N.E.2d 384 (Ill. Ct. App. 2003) (holding that a hospital lien seeks to recover the tortfeasor's debt to the hospital, rather than the patient's). Based upon the divergent results reached by courts, we recognize that these two principles—that a lien presupposes a debt and that medical services rendered give rise to a debt owed by the patient—rest together uneasily in the context of hospital liens filed on settlements between patients and tortfeasors or insurers covering their liability, where there is often an entity (whether it be a public medical assistance agency, an HMO, or a third-party tortfeasor) that may be ultimately responsible for paying the bill. Courts have wrestled with the resulting tension in a variety of different ways. *See generally* 16 A.L.R. 5th 262, § 56[a], Effect of Extinguishment of Lien—On patient's underlying debt (collecting cases). This is a large and divergent body of law, dealing with many distinctive statutory and contractual issues, and we do not think it necessary or

possible to synthesize it into a single, coherent whole.

However, we can glean from these cases an inference that, if there is any ambiguity or uncertainty as to whether the hospital may bill a patient, or a third party, for the patient's debt, we cannot assume that the debt is foreclosed by law for purposes of the hospital lien. In other words, the debt must be fully extinguished in order to say that the lien is also extinguished. One can infer that proposition from the fact that courts have disallowed liens in such circumstances only when there is no doubt that someone other than the patient is responsible for satisfying the debt. *See generally, e.g., **Dorr v. Sacred Heart Hosp.***, 597 N.W.2d 462 (Wis. Ct. App. 1999) (finding no debt because of contractual and statutory immunity); ***MCG Health, Inc. v. Owners Ins. Co.***, 707 S.E.2d 349, 352–53 (Ga. 2011) (finding that a medical college could not enforce a lien because regulations gave the federal government the sole right to collect payment for medical care); ***Satsky v. United States***, 993 F. Supp. 1027, 1029 (S.D. Tex. 1998) (finding no debt because the insurer already paid the bill in full); ***Parnell***, 109 P.3d at 79 (same). Applying this general principle to the case at bar, we hold that a patient's debt to a hospital is extinguished for purposes of a hospital lien placed upon a settlement between a patient and an insurer covering a tortfeasor's liability, if it ever is, only when the hospital is legally barred from ever billing the patient, either directly or indirectly (through a third party). The question, then, is whether the Med is legally barred from ever billing these Appellants again, directly or indirectly, upon receipt of TennCare and insurance payments. We begin with Mr. Garland's case.

### C. TennCare

The federal program commonly known as "Medicaid" was established by an amendment to the Social Security Act known as the "Medicaid Act" contained in Title XIX. *See* 42 U.S.C. § 1396 et seq. "Medicaid is a cooperative federal-state program through which the federal government provides financial aid to states that furnish medical assistance to eligible low-income individuals." ***Harris v. McRae***, 448 U.S. 297, 301 (1980); ***S.D. ex rel. Dickson v. Hood***, 391 F.3d 581, 585–86 (5th Cir. 2004). Medicaid, therefore, is an exercise in so-called "cooperative federalism," whereby states voluntarily opt into the federal scheme and thereby bind themselves to abide by the rules and regulations imposed by the federal government in return for federal funding. ***Harris***, 448 U.S. at 308. The Tennessee Department of Finance and Administration is the Tennessee state agency that administers the Medicaid program in Tennessee, known as TennCare. Tenn. Code Ann. § 71-5-104; Tenn. Exec. Order No. 23 (Oct. 19, 1999). Because the State of Tennessee has joined the federal Medicaid system, it has consequently committed itself to following the federal law governing that system. ***Id.***; *see also **Markva v. Haveman***, 317 F.3d 547, 550 (6th Cir. 2003).

As set out in the Department of Health and Human Services Regulations governing the Medicaid Program, and specifically dealing with state plan requirements relating to third

party liability, the federal government requires states participating in Medicaid to institute "third party liability . . . programs" designed to "ensure that Federal and State funds are not misspent for covered services to eligible Medicaid recipients when third parties exist that are legally liable to pay for those services." In full context:

> The Medicaid program established by title XIX of the Social Security Act (the Act), provides medical assistance to certain low-income individuals and is administered by the States in accordance with Federal requirements. The program by law is intended to be the payor of last resort; that is, other available third party resources must be used before the Medicaid program pays for the care of an individual eligible for Medicaid.
>
> A third party is any individual, entity or program that is or may be liable to pay all or part of the expenditures for medical assistance furnished under a State plan. Examples of liable third parties include commercial insurance companies, either through employment-related or privately-purchased health insurance, or through casualty-related coverage available as a result of an accidental injury; payments received directly from an individual who either has accepted voluntarily or been assigned legal responsibility for the health care of one or more Medicaid recipients; fraternal groups; unions; or State workers' compensation commissions. Other examples of a third party resource would include medical support provided through an absent parent and entities providing medical services.
>
> The overall purpose of State Medicaid third party liability (TPL) programs is to ensure that Federal and State funds are not misspent for covered services to eligible Medicaid recipients when third parties exist that are legally liable to pay for those services.

55 C.F.R. §1423. To achieve these goals, the federal government requires states to comply with federal statutes designed to set forth the methods for discovering when third parties are legally obligated to pay for medical expenses covered by the plan, and also to establish a system for pursuing third party funds where they are available. The applicable federal statute, 42 United States Code Annotated Section 1396a, sets forth the requirements for state plans for medical assistance, and provides, in pertinent part, as follows:

(a) Contents

A State plan for medical assistance must–

\*                          \*                          \*

(18) comply with the provisions of section 1396p of this title with respect to liens, adjustments and recoveries of medical assistance correctly paid, transfers of assets, and treatment of certain trusts.[5]

\*                          \*                          \*

(25) provide--

(A) that the State or local agency administering such plan will take all reasonable measures to ascertain the legal liability of third parties (including health insurers, self-insured plans, group health plans (as defined in section 607(1) of the Employee

---

[5] 42 United States Code Annotated Section 1396p Liens, adjustments and recoveries, and transfers of assets provides:

> (a) Imposition of lien against property of an individual on account of medical assistance rendered to him under a State plan
> (1) No lien may be imposed against the property of any individual prior to his death on account of medical assistance paid or to be paid on his behalf under the State plan, except--
>
> (A) pursuant to the judgment of a court on account of benefits incorrectly paid on behalf of such individual, or
>
> \*                    \*                    \*
>
> (b) Adjustment or recovery of medical assistance correctly paid under a State plan
> (1) No adjustment or recovery of any medical assistance correctly paid on behalf of an individual under the State plan may be made, except that the State shall seek adjustment or recovery of any medical assistance correctly paid on behalf of an individual under the State plan in the case of the following individuals: [following named individuals are inapplicable to the case at bar]

Retirement Income Security Act of 1974 [29 U.S.C. 1167(1)]), service benefit plans, managed care organizations, pharmacy benefit managers, or other parties that are, by statute, contract, or agreement, legally responsible for payment of a claim for a health care item or service) to pay for care and services available under the plan, including--

*                                    *                                    *

(C) that in the case of an individual who is entitled to medical assistance under the State plan with respect to a service for which a third party is liable for payment, the person furnishing the service may not seek to collect from the individual (or any financially responsible relative or representative of that individual) payment of an amount for that service (i) if the total of the amount of the liabilities of third parties for that service is at least equal to the amount payable for that service under the plan. . . .

Of the federal law concerning third party liability, the most important to the instant lawsuit is 42 United States Code Section 1396a(a)(25)(C). As set out in full context above, that provision requires state Medicaid plans to ensure that, in the case of an individual who is entitled to medical assistance under the state plan with respect to services for which a third party is liable for payment, the person furnishing the service may not seek to collect from the individual (or any financially responsible relative or representative of that individual) payment of an amount for that service (i) if the total of the amount of the liabilities of third parties for that service is at least equal to the amount payable for that service under the plan. . . ." 42 U.S.C. §1396a(a)(25)(C). In other words, hospitals "may not seek to collect [money] from [Medicaid-eligible] individuals where third parties are obliged to pay an amount at least equal to the amount that would be paid by Medicaid for the service." **Wesley Health Care Ctr., Inc. v. DeBuono**, 244 F.3d 280, 281 (2d Cir. 2001).

Accordingly, a threshold question is whether liens such as the Med's (that is, attaching to settlements between tortfeasors and Medicaid-eligible patients) constitute efforts to "collect from" the patient. If they do not, as argued by the Med, then 42 United States Code Section 1396a(a)(25)(C)'s limitations on such efforts, and the parallel Tennessee provisions enacted to ensure Tennessee's compliance with the federal mandate, discussed below, do not come into play and our analysis can end there. However, if the Med's liens do constitute efforts to "collect from" the patient, then we must examine the content of Section 1396a(25)(C) more closely to determine whether it bars the lien. We now turn to address the

question of whether the Med's liens should be considered an effort "to collect from" the patient.

Both case law and logic indicate that the Med's liens must be considered an effort "to collect from" the patient. First, federal appellate decisions in this area of law have either assumed, *Miller v. Gorski Wladyslaw Estate*, 547 F.3d 273, 282 (5th Cir. 2008), or outright held that a lien directed at a future settlement between a tortfeasor and a Medicaid-eligible patient represents an attempted recovery against the patient, not against the tortfeasor (or his or her insurer). *Spectrum Health Continuing Care Grp. v. Anna Marie Bowling Irrevocable Trust*, 410 F.3d 304, 318 (6th Cir. 2005) ("[B]y seeking to enforce its lien, Spectrum is attempting to recover its customary fee **from the Medicaid patient herself** . . . .") (emphasis added). As the Sixth Circuit persuasively reasoned in *Spectrum*, the lien attaches only once the settlement is approved; and once the settlement is approved, the money belongs to the patient, not the tortfeasor (or his or her insurer). *Id*.; *see also Olszewski v. Scripps Health* 69 P.3d 927, 943 (Cal. 2003) ("Recovery on a [healthcare] provider lien [against a settlement between a Medicaid-eligible patient and a tortfeasor] therefore comes from the [Medicaid] beneficiary—and not from the third party tortfeasor—for purposes of federal law."). In addition, the only reason the hospital has a lien in the first place is because it provided medical services to the patient (not some other entity) and because the patient (not some other entity) therefore owes it a debt, *see* discussion above.

Having answered in the affirmative the threshold question of whether the Med's lien was an effort "to collect from" Mr. Garland, and thus subject to the federal rule, we are now required to determine whether the rule bars the lien. To reach that determination, it is instructive to consider federal cases dealing with similar issues. Several federal courts of appeal have issued published decisions concerning liens similar to the Med's.

In *Miller v. Gorski Wladyslaw Estate*, 547 F.3d 273 (5th Cir. 2008), Jose Alfaro ("Alfaro"), an individual who later became eligible for Medicaid, was injured when his car and a truck collided in Louisiana. *Id.* at 276. He received care at Baton Rouge General Medical Center ("Baton Rouge General"). *Id.* While hospitalized, he filed a federal lawsuit against the truck company seeking damages for the injuries he sustained in the crash. *Id*. Baton Rouge General then filed a lien pursuant to Louisiana state law to recover its medical expenses from any future settlement or judgment Alfaro received from the truck company. *Id*. Baton Rouge General later intervened in Alfaro's lawsuit, which was resolved through settlement. *Id*. At that point, Baton Rouge General filed a motion for partial summary judgment to recover the expenses it incurred in treating Alfaro. *Id*. A magistrate judge granted that motion. *Id*. at 277.

On appeal, the Fifth Circuit affirmed. *Id*. at 276. The court began with the proposition

that federal law "requires that each state's Medicaid agency take measures to find out when third parties . . . are legally obliged to pay for services covered by Medicaid." *Id*. at 278. The *Miller* Court observed that Louisiana incorporated this federal mandate into its state code by requiring the state Medicaid agency to seek out and collect money from third parties liable for injuries to Medicaid-eligible patients. *Id*. at 279. The same is true in Tennessee. *See* Tennessee Rule and Regulation 1200-13-01-.01(3) ("Providers receiving third party payments following Medicaid payment shall notify and refund Medicaid within 60 days of receipt of third party payment."); *see also* footnotes 1 and 2, *supra*.

Turning to the validity of Alfaro's liens, the Fifth Circuit took up Alfaro's argument that "a health care provider cannot seek to collect payments from that patient if a third party is liable for the patient's medical expenses." *Id*. at 282. The court rejected this argument because "[c]ase law uniformly indicates that the limitations on provider reimbursement are triggered . . . when a provider elects to bill[,] and accepts payment from [,] Medicaid for the services it provides to the patient." *Id*. (citations omitted).

Elaborating on its reasoning, the Fifth Circuit noted that 42 U.S.C. § 1396a(25)(C) was designed to proscribe the practices of "balance" and "substitute" billing. *Id*. at 282–83. "Balance billing" occurs when a hospital bills Medicaid, receives reimbursement for less than the requested amount, and then seeks to recover from the patient the difference between the medical expenses charged and the reimbursement from Medicaid. *Id*. at 282–83. "Substitute billing" takes place when a hospital bills Medicaid, is dissatisfied with the size of the reimbursement, and therefore tries to return the payment in order to charge the patient a larger amount than it received from the government. *Id*. at 283. As such, the Fifth Circuit held in *Miller* that the prohibition in § 1396a(25)(C) is triggered only when a hospital submits a bill to Medicaid. *Id*. ("Logically, a provider cannot attempt to engage in 'balance billing' or 'substitute billing' unless it has initially billed Medicaid"). "Therefore, the prohibition against these practices is not triggered until a provider bills and accepts payment from Medicaid for services provided to a Medicaid-eligible patient." *Id*.

Before turning to other federal cases, we note that, in the instant case, the Med argues that it is not "balance billing" its patients. According to the foregoing definition, that statement is true. However, the Med's practice of returning payments constitutes "substitute billing." As discussed in *Olszewski*:

> Defendant's contention that federal law prohibits only balance billing—and not the substitute billing . . . is not persuasive. We acknowledge that liens filed pursuant to section 14124.791 are not strictly a form of balance billing because the lien holder must refund the Medi–Cal payment before recovering on them.

> But nothing in the language or history of the federal statutes and regulations restricting provider recovery from Medicaid beneficiaries limits their restrictions to balance billing. The mere fact that "[t]hese restrictions are commonly known as the prohibition against 'balance billing' " does not mean that these restrictions only prohibit balance billing. (Palumbo v. Myers, supra, 149 Cal.App.3d at p. 1025, 197 Cal.Rptr. 214.).

*Olszewski*, 69 P.3d at 945–46.  Accordingly, the Med's argument here is strictly semantic as it is precluded from engaging in either practice.

In *Evanston Hosp. v. Hauck*, 1 F.3d 540 (7th Cir. 1993), the Seventh Circuit held that billing and accepting payment from Medicaid prevented a hospital from later seeking to enforce its hospital lien against the damages award a patient recovered from a third-party tortfeasor liable for his medical expenses. *Evanston*, 1 F.3d at 542. There, a hospital treated an uninsured, Medicaid-eligible patient who suffered injuries in an accident. The hospital billed and accepted payment from Medicaid for the services it furnished to him. After receiving the Medicaid payment, which was less than its customary fee, the hospital served a hospital lien on a personal injury lawsuit brought on the patient's behalf against the third party tortfeasor. *Evanston Hospital v. Hauck*, No. 92 C 732, 1992 WL 205900, at *1 (N.D.Ill. Aug. 19, 1992). Several years later, when the patient won a multimillion dollar judgment in his personal injury lawsuit, the hospital sought to enforce its lien against the judgment to recover its full customary fee.

The Seventh Circuit concluded that the hospital could not return the Medicaid payment and enforce its lien because it had already accepted money from Medicaid for the services it furnished to the patient. The court, however, explicitly stated that the hospital could have enforced its lien against the patient's damages award if it had not accepted the Medicaid payment:

> Evanston Hospital was not "forced" to abandon its right to sue Hauck; no one coerced the hospital into cashing a $113,424 check from the taxpayers as partial reimbursement for Hauck's medical bills. Rather, the hospital could have simply forsaken Medicaid and taken its chances that Hauck would somehow come up with the money to pay the bills himself. By opting for reimbursement from Medicaid, Evanston Hospital bought certainty. It purchased a guarantee of partial payment in lieu of possibly full payment or possibly no payment at all. Risk-averse companies that are owed money (or which do not want the

hassle) make this same deal all the time with collection agencies-something secure is traded for a crack at a higher sum. Evanston Hospital wants out of its agreement with Medicaid now only because its gamble, in retrospect, was unwise.

*Evanston*, 1 F.3d at 542.

The Sixth Circuit reached the same conclusion in *Spectrum Health Continuing Care Group v. Anna Marie Bowling Irrecoverable Trust Dated*, 410 F.3d 304 (6th Cir. 2005). In that case, a health care center treated a patient who had been injured during a botched surgery. At the time she was admitted to the center, the patient was uninsured and ineligible for Medicaid. The center agreed to admit her on the condition that she execute a lien on the proceeds of any settlement or verdict she recovered in a medical malpractice lawsuit. Five months after the patient was admitted to the center, she became eligible for Medicaid. Because the center did not know when, or if, it would recover on its lien, it decided to bill and accept payments from Medicaid for her medical care. These payments were less than the center's customary fees. Three years later, when the patient recovered a settlement from a third-party tortfeasor, the center tried to enforce its lien against the settlement to recover the balance between the Medicaid payments it had accepted and its customary fees.

As in *Evanston*, the Sixth Circuit denied recovery because the center had already accepted Medicaid payments as payment in full and enforcing the lien would be an attempt to recover from the patient when a third party was liable for her medical expenses. The court noted, however, that the hospital could have avoided this result:

> Spectrum [the health care center] was not required to seek payment from Medicaid; instead, Spectrum could have provided its services in exchange for enforcing its lien, which was the original agreement between the parties. Having chosen to accept payment from Medicaid however, Spectrum abandoned all rights to further recovery of its customary fee from the lien. As we have stated, Medicaid is a contract between a service provider and the government, in which the Medicaid recipient is a third-party beneficiary. By accepting the Medicaid payment, the service provider accepts the terms of the contract—specifically that the Medicaid amount is payment in full. If this arrangement is not acceptable to [service providers], they should not take Medicaid money in the first instance.

*Spectrum*, 410 F.3d at 315 (internal quotation marks and citations omitted). Moreover, the

court remarked that "[if the health care center] had not received Medicaid payments, the lien would be enforceable against [the tort settlement] as a voluntary agreement entered into by willing parties, even though the patient was Medicaid-eligible." *Spectrum*, 410 F.3d at 316 (citation omitted). Once the health care center "accepted the Medicaid payment, however, [it] had been paid in full for the services provided to [the patient]. The mere fact that a prior voluntary agreement existed is without consequence." *Spectrum*, 410 F.3d at 316 (footnote omitted).

In *Mallo v. Public Health Trust of Dade County*, 88 F. Supp.2d 1376 (S.D. Fla. 2000), the court held that, after a hospital accepted payment from Medicaid, it could not enforce a pre-existing lien against a tort settlement recovered by the patient. But the court noted that the hospital could have enforced its lien if it had not accepted payment from Medicaid. Specifically, the court stated that the federal mandate prohibiting "balance billing," 42 U.S.C. § 1396a(25)(C), "[f]orc[es] providers to make a calculated choice whether to apply for Medicaid assistance." *Mallo*, 88 F. Supp.2d at 1387. Once a health care provider commits to Medicaid assistance for a patient, the provider is barred from billing the patient for an amount in excess of the State's Medicaid disbursement. By contrast, should the health care provider elect not to apply for Medicaid assistance, then the provider can charge the market value of the treatment. *Id.* at 1386–87.

From these cases, it is clear that the limitations on a health care provider's ability to obtain reimbursement for the services it provides a Medicaid-eligible patient are not triggered until a provider bills and accepts payment from Medicaid for those services. If a provider chooses not to bill and accept payment from Medicaid, then it remains free to seek its entire customary fee from the patient. However, the provider runs the risk of not recovering anything from the patient because the patient may never have the ability to pay his or her medical expenses, or the third party payment may not come to fruition. The federal Medicaid scheme, however, gives providers the opportunity to make a "calculated choice" whether to seek reimbursement from Medicaid or from the patient.

Tennessee Rules and Regulations of the Tennessee Department of Finance and Administration Bureau of TennCare Sections 1200-13-01-.04 (17)–(18) provide:

> (17) Third party is not established or available on the date of service (example: automobile accident - party possibly at fault with liability coverage which may pay recipient medical claims.)
> (a) A provider may elect to bi[ll] the anticipated liable third party for a covered Medicaid service, or
> (b) If the provider elects to bill Medicaid, Medicaid will recover from the third party.

-30-

(c) The provider may not include charges for covered services billed to Medicaid in an independent claim to the potentially liable third party.
(d) The provider may void a claim previously paid by Medicaid at any time in an attempt to recover a larger payment from a potentially liable third party.
(e) Medicaid may not be billed for a covered service under the plan following the expiration of Medicaid's timely filing limits.

(18) A provider may keep the total third party payment even if it exceeds the Medicaid allowable amount.[6]

Administrative rules and regulations have "the force and effect of law in Tennessee." **Swift v. Campbell**, 159 S.W.3d 565, 572 (Tenn. Ct. App. 2004) (citing **Kogan v. Tenn. Bd. Of Dentistry**, No. M2003-00291-COA-R3-CV, 2003 WL 23093863, at *5–6 (Tenn. Ct. App. Dec. 30, 2003)).

The Med argues that this Regulation is "crystal clear," allowing the Med to void a claim paid by TennCare **at any time** to recover a larger payment from a third-party tortfeasor. The Med further argues that, by enacting the foregoing rules and regulations, TennCare "has intentionally delegated providers the ability to recover TennCare payments on its behalf and, therefore, asserts its role as the 'payor of last resort.'" The Med's interpretation is not, however, as "crystal clear" as it claims. In the first instance, and as discussed in detail above, the Med is prohibited from both "balance billing" and "substitute billing" pursuant to federal law. Accordingly, we cannot interpret the foregoing rule, i.e.,

---

[6] We are cognizant of the fact that Tenn. R. & Regulation Section 1200-13-01 addresses TennCare regulations pertaining to TennCare's Long-Term Care delivery system and does not explicitly apply to the emergency treatment of accident victims, a point relied upon by Appellants for the proposition that this section of the Rules and Regulations is inapplicable to the case at bar. However, to the extent that Section 1200-13-01 addresses the treatment of accident victims under TennCare, we must respectfully disagree with Appellants' argument that the regulation is inapplicable to this case. Section 1200-13-01-.04 (17), cited above, is not ambiguous and clearly applies to scenarios, such as the those present here, where a patient is injured in an "automobile accident" and the third "party possibly at fault with liability coverage which may pay recipient medical claims" is not known. In this regard, Section 1200-13-01 is not limited to long-term TennCare patients. Rather, when read in its entirety, this Section addresses institutional providers such as the Med in providing its services. Moreover, TennCare provisions relating to TennCare's long-term care program were enacted in March 2010 pursuant to TennCare's emergency rulemaking authority and four (4) years after Mr. Garland's admission to the Med, which occurred in January 2006. However, in 2010, the Legislature did not amend, recall, or reorganize Section 1200-13-01-.04, Third Party Resources, whatsoever. In fact, since its last revision in 1989, Section 1200-13-01-.04 has not been changed, amended or otherwise disturbed by legislation.

that a "provider may void a claim previously paid by Medicaid at any time in an attempt to recover a larger payment from a potentially liable third party," to give the Med the right to "substitute bill." Under the Supremacy Clause of the United States Constitution, federal law "shall be the supreme law of the land." U.S. Const. art. VI, cl. 2. Federal law may preempt state law in one of three ways: 1) expressly, 2) by implication, or 3) by a direct conflict between federal and state law. *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995). Accordingly, to the extent that the Tennessee Rules and Regulations can be interpreted to allow a hospital to balance bill or to substitute bill, they are in direct conflict with the federal prohibition against these practices. Accordingly, federal law will govern.

In support of its case, the Med contends, *inter alia*, that it is obligated to pursue third-party payees in order to uphold the TennCare requirements as set forth in the Tennessee Rules and Regulations Section 1200-13-13-.09, which addresses third party resource and provides, in relevant part, as follows:

> (3) Managed Care Contractors under contract with the Tennessee Departments of Finance and Administration or Mental Health and Developmental Disabilities shall provide all third party resource information obtained from the plan's enrollees to the Bureau of TennCare on a regular basis as required by their contracts.
> (4) Managed Care Contractors shall enforce TennCare subrogation rights pursuant to T.C.A. §71-5-117.
> *                                                    *
>                          *
> (6) TennCare shall be the payor of last resort, except where contrary to federal or state law.

Tennessee Code Annotated Section 71-5-117, however, states that the department "may require or permit that responsible parties of a recipient of medical assistance supplement or reimburse for any benefit or benefits rendered to the recipient pursuant to this part" only "to the extent permitted by federal law." Merely because TennCare is the "payor of last resort" does not, *ipso facto*, mean that the hospital gains a right to pursue subrogation on behalf of Medicaid. This issue was discussed in the *Evanston* case, where the court noted:

> In any event, Medicaid was the payor of last resort at the time Hauck's medical bills came due. Hauck was released from the hospital on November 14, 1986. It was not until December of 1991 that Hauck prevailed on his tort claim. When IDPA[i.e.,

the Indiana Department of Public Aid] agreed to pay $113,424 for Hauck's care and Evanston Hospital agreed to accept that sum as total payment, Hauck's $9.6 million award was merely a gleam in the eye of a personal injury lawyer. Even if there were a payor-of-last-resort requirement in Medicaid law, it could not have the meaning plaintiff proposes because there will always be some possibility that an indigent patient will emerge victorious in a future lawsuit, win the lottery, strike gold, or land a good job and save some money. Under plaintiff's reading of Medicaid law, no state administrative agency could ever qualify as a Medicaid payor of last resort because alternative sources of reimbursement might later emerge.

More to the point, Evanston Hospital misconstrues the notion of what it means to be a payor of last resort. To the extent such a concept is implicit in the federal statute, it means that the government itself should not be stuck paying medical bills when another source is available, not that hospitals and doctors should reap a windfall at the government's expense. Thus both federal and Illinois law agree that once Medicaid has paid for medical services, IDPA is obliged to vigorously pursue any third party who might bear some legal responsibility for footing the bill. Under federal law, a state must:

> take all reasonable measures to ascertain the legal liability of third parties (including health insurers) to pay for care and services available under the plan * * * [and] in any case where such a legal liability is found to exist after medical assistance has been made available on behalf of the individual and where the amount of reimbursement the State can reasonably expect to recover exceeds the cost of such recovery, the State or local agency will seek reimbursement for such assistance to the extent of such legal liability.

42 U.S.C. § 1396a(a)(25)(A)-(B). The statute does not say anything about turning over this right of reimbursement to the hospitals and doctors who have already received some

compensation for their services. Again, Congress' intent that state Medicaid agencies, not hospitals or doctors, seek reimbursement from third parties is evident in another section of the Medicaid statute that requires indigent recipients of benefits to assign to the government whatever rights they might have in payment for medical care from other sources. 42 U.S.C. §§ 1396a(a)(45) and 1396k(a). If this arrangement is not acceptable to doctors and hospitals, they should not take Medicaid money in the first instance.

*Evanston*, 1 F.3d at 543.

Moreover, 42 Code of Federal Regulations Section 447.15 provides, in pertinent part, that:

A State plan must provide that the Medicaid agency must limit participation in the Medicaid program to providers who accept, as payment in full, the amounts paid by the agency plus any deductible, coinsurance or copayment required by the plan to be paid by the individual. . . .

In addition, Tennessee Rules and Regulations 1200-13-13-.08 provides, in relevant part, that:

(1) Payment in full.
(a) All Participating Providers, as defined in this Chapter, must accept as payment in full for provision of covered services to TennCare enrollees, the amounts paid by the MCC plus any copayment required by the TennCare Program to be paid by the individual.

\*                                    \*                                    \*

(3) Participation in the TennCare program will be limited to providers who:

(a) Accept, as payment in full, the amounts paid by the managed care contractor, including copays from the enrollee, or the amounts paid in lieu of the managed care contractor by a third party (Medicare, insurance, etc.);

$*$ $*$ $*$

(f) Comply with all contractual terms between the provider and the managed care contractor and TennCare policies as outlined in federal and state rules and regulations and TennCare provider manuals and bulletins.

$*$ $*$ $*$

(6) Providers may not seek payment from a TennCare enrollee under the following conditions:

$*$ $*$ $*$

(c) The provider accepted TennCare assignment on a claim and it is determined that another payer paid an amount equal to or greater than the TennCare allowable amount.

*Id.*; *see also* Tenn. R. & Reg. 1200-13-14-.08. These promulgations are in keeping with the mandates of the federal statute: "[I]n the case of an individual who is entitled to medical assistance under the State plan with respect to a service for which a third party is liable for payment, the person furnishing the services may not seek to collect from the individual (or any financially responsible relative or representative of that individual) payment of any amount for that service . . . ." 42 U.S.C. § 1396a(a)(25)(C). What the Med seeks, then, is to convert the system into an insurance program for hospitals rather than for indigent patients. It wants to be reimbursed by TennCare when the patient is indigent and still retain the right to enforce its lien should the patient win a settlement from a third-party. This is a classic example of wanting to both have the proverbial cake, and eat it, too.

Although *Spectrum* and *Mallo* involved a provider that asserted a hospital lien on any tort settlement or judgment recovered by an indigent patient **before** the patient became eligible for Medicaid, those cases clearly recognized that a provider may assert its pre-existing hospital lien, even after a patient became eligible for Medicaid, **so long as the provider did not bill and accept payment from Medicaid**. Here, the Med did accept payment from Medicaid and, after accepting such payment, continued to assert its lien. Under the reasoning of the foregoing cases, we conclude that this practice is not authorized under federal and Tennessee law. Once the hospital accepts payment from TennCare at the rate prescribed in the hospital services agreement, the hospital has received the benefit of its bargain–a price certain payment. As a third-party beneficiary of the agreement between the provider and the government, the patient's debt is extinguished by payment of the agreed-

upon amount and the hospital may not hold its lien open pending possible larger payment at some future date. Accordingly, the hospital has the choice of accepting sure payment, or foregoing that payment in favor of the possibility of a larger payment later, but it cannot do both.

## D. Contracts

Ms. West and Ms. Heags-Johnson's are insured by BCBS and BHSG respectively. As noted above, the Med has entered into hospital services agreements with both BCBS and BHSG. While Mr. Garland's case required us to harmonize federal Medicaid law with the HLA, Ms. West and Ms. Heags-Johnson's cases require us to harmonize the HLA with the specific contract provisions set out in the BCBS Institution Agreement and the BHSG Network Contract respectively. Before turning to the particulars of those contracts, we begin with a basic proposition common to both Ms. West and Ms. Heags-Johnson's cases.

In *Benton v. Vanderbilt University*, 137 S.W.3d 614 (Tenn. 2004), our Supreme Court addressed the question of whether a patient is bound by an arbitration clause in a hospital services contract entered by and between the hospital and the patient's insurance company. The Court concluded that, as a third-party beneficiary of the hospital services agreement, a patient is bound by the terms of that contract. Specifically, the Court held:

> Having observed that arbitration contracts are favored in Tennessee, we next discuss the rights and obligations of third-party beneficiaries to a contract. As the Court pointed out in *Owner–Operator Independent Drivers Association v. Concord EFS, Inc*., 59 S.W.3d 63 (Tenn. 2001), a third party is an intended third-party beneficiary of a contract, and thus entitled to enforce the terms of a contract, where (1) the parties to the contract have not otherwise agreed, (2) recognition of the third-party's right to performance is appropriate to effectuate the parties' intent, and (3) terms or circumstances indicate that performance of the promise is intended or will satisfy an obligation owed by the promisee to the third party. *Id*. at 70.
>
> This Court has also said that a third-party's rights "depend upon and are measured by the terms of the contract." *United States Fid. & Guar. Co. v. Elam*, 198 Tenn. 194, 278 S.W.2d 693, 702 (1955). "Before the beneficiary may accept the benefits of the contract, he must accept all of its implied, as well as express, obligations." *Id*. As we have explained, **"if the beneficiary accepts, he adopts the bad as well as the good, the burden as well as the benefit**." *Id*.

***Benton***, 137 S.W.3d at 618. (emphasis added). Although the ***Benton*** case did not directly address the question presented in the instant appeal, we rely on it for the proposition that, just as TennCare enrollees are third-party beneficiaries of the agreement between a service provider and the government (*supra*), Ms. West and Ms. Heags-Johnson are third-party beneficiaries of their insurance carrier's respective services contracts with the Med. As such, they receive the benefit of the contract. ***Id***.

For the medical services provided to Ms. West and Ms. Heags-Johnson, it is undisputed that the Med received payment from their respective insurance companies in the amounts specified in the hospital services agreements, i.e., adjusted amounts. Under both the BCBS Institution Agreement and the BHSG Network Contract, the Med agreed to accept the adjusted amounts as "payment in full." As set out in the patients' bills, *supra*, once the adjusted payments were received, the Med showed that the patients' entire debt had been extinguished, i.e., showed a $0 balance.[7] Indeed, the bills sent by the Med noted the hospital's usual and customary charges and indicated that the difference between these charges and the amount owed under the insurance contract was "adjusted." The patient, as a third-party beneficiary of the services contracts is entitled to the benefit of the adjusted rates if the hospital chooses to accept the insurance payment. In accepting such payment, the hospital has agreed to extinguish the patient's debt. Because the patients no longer owed a debt to the Med for its services, we conclude that the Med may not assert a lien under the HLA against Appellants' recovery from any third party tortfeasor.

In reaching this conclusion, we follow the lead of most of our sister states that have addressed the same question under hospital lien statutes analogous to the Tennessee HLA. *See **Satsky v. United States,*** 993 F. Supp. 1027 (S.D. Tex. 1998) ("As there is no debt, there can be no lien"); ***Maxwell v. South Miami Hospital Foundation, Inc.***, 385 So.2d 127 (Fla. Dist. Ct. App. 1980) (holding that settlement of the debt underlying the hospital's lien extinguished the lien); ***Lopez v. Morley*** 817 N.E.2d 592, 599 (Ill. Ct. App. 2004) (holding that a hospital's lien "covers only the amounts of the debt owed"); ***Midwest Neurosurgery, P.C. v. State Farm Ins. Cos***., 686 N.W.2d 572, 581 (Neb. 2004) (limiting the hospital's lien to the amount the hospital agreed to accept as payment in full from the patient and his insurer); ***Wright v. First Nat'l Bank in Albuquerque***, 941 P.2d 498, 500–501 (N.M. 1997) (holding that the hospital could not assert a lien for its full charges because it had agreed to

---

[7] We note that Ms. Heags-Johnson's second bill showed a balance of $54.14. The parties concede that this amount is comprised of co-payments and fees. Because recovery pursuant to a lien under the HLA is contingent on the patient's recovery of damages from a third party tortfeasor, it is not a patient copayment, and so this small balance on Ms. Heags-Johnson's account does not allow the Med to keep its lien for recovery of the copayments alone.

accept the insurance payment as payment in full); **Dorr**, 597 N.W.2d at 473 (holding that "the hospital is precluded from making any claim for payment" using the lien statute because its provider agreement "negates the existence of a debt owed by the" patient "to the hospital").

To the extent our sister courts have reached a contrary conclusion, most of those cases are distinguishable. For example, in **Alaska Native Tribal Health Consort. v. E.R.** 84 P.3d 418 (Alaska 2004), a case relied upon by the Med in its brief, the Alaska Supreme Court held that a hospital may assert a lien against a native Alaskan even though federal law provides that patient with free health care. **Id.** at 421. In reaching this conclusion, the court relied on the fact that "federal law makes clear that [the native] does not personally have to owe [the hospital] anything for a debt to arise from his receipt of free medical services . . . ." **Id**. at 425. By contrast, there is no analogous federal law implicated in this case. In any event, **Alaska Native Tribal Health Consortium** does not appear to be applicable to Tennessee's hospital lien statutes because recovery under Alaska's hospital lien statute is subject to equitable apportionment under the common fund doctrine. **Id**. at 421, 434.

The Med also relies upon the case of **Andrews v. Samaritan Health System**, 36 P.3d 57, 61 (Ariz. Ct. App. 2001), disapproved on other grounds in **Blankenbaker v. Jonovich**, 71 P.3d 910 (Ariz. 2003). Like the Alaska case, we find **Andrews** to be inapposite. In **Andrews**, the Arizona Court of Appeals concluded that a hospital could assert a lien to recover the difference between the contract payments and its customary charges. But, unlike the BHSG Network Contract and the BCBS Institution Agreement, the hospital services agreements at issue in **Andrews** expressly reserved the hospital's "right to recapture" this difference. **Id**. at 61. No such language appears in the contracts at issue here. Although **Andrews** did extend its holding to a provider agreement analogous to the Med's agreements, it did so based on the language of Arizona's hospital lien statute which, unlike the Tennessee HLA, states that a hospital "'is entitled to a lien for the customary charges for care and treatment . . . of an injured person' without specifying further action by the hospitals." **Id.** at 61.

The only case relied upon by the Med that squarely supports the Med's interpretation of the HLA is **Rogalla v. Christie Clinic**, 794 N.E.2d 384 (Ill. Ct. App. 2003). In that case the court held that a hospital lien seeks to recover the tortfeasor's debt to the hospital, and not the patient's debt, a proposition that we decline to follow, *see supra*. Based upon this proposition, the **Rogalla** Court concluded that a medical provider may recoup payments via a provider lien as a result of a third-party tortfeasor's actions, even if the provider has accepted payment from the patient's HMO as payment in full. But *see* **Lopez v. Morley**, 817 N.E.2d at 599 (holding that the lien "covers only the amounts of the debt owed"). **Rogalla** is not binding on this Court, and furthermore appears to be in conflict with the majority of jurisprudence on this question. Accordingly, we decline to follow it.

In doing so, we recognize that the Med faces mounting financial pressures in providing medical services to the community. We also recognize that our ruling may result in financial hardship for the hospital in providing this service. Although we have no wish to exacerbate the financial crisis faced by the Med, our job is to construe our statutes in accordance with the Legislature's intent and the controlling caselaw. As such, hospitals may look to the Legislature for relief from these financial pressures, but not to this Court. By precluding the Med from asserting its liens under the HLA in this case, we "simply give[ ] effect to" its contracts, *Lopez*, 817 N.E.2d at 599, by allowing the patients the benefit of the contractual rates as third-party beneficiaries of these contracts.

For the foregoing reasons, we reverse the order of the trial court. The case is remanded for entry of an order quashing the Med's liens and for such further proceedings as may be necessary and are consistent with this opinion. Costs of this appeal are assessed against the Appellee, Shelby County Healthcare Corp., d/b/a Regional Medical Center at Memphis, for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE